[L. A. No. 28897. In Bank. Oct. 25, 1966.]

VERNON DARTMOUTH GRAY, Plaintiff and Appellant, v. ZURICH INSURANCE COMPANY, Defendant and Respondent.

264

Robert L. Brock, Edwin S. Saul and Brock & Fleishman for Plaintiff and Appellant.

William J. Currer, Jr., as Amicus Curiae on behalf of Plaintiff and Appellant.

Moss, Lyon & Dunn, Gerold C. Dunn and Henry F. Walker for Defendant and Respondent.

TOBRINER, J.—This is an action by an insured against his insurer for failure to defend an action filed against him which stemmed from a complaint alleging that he had committed an assault. ▮▮▮ The main issue turns on the argument of the insurer that an exclusionary clause of the policy excuses its defense of an action in which a plaintiff alleges that

the insured intentionally caused the bodily injury. Yet the language of the policy does not clearly define the application of the exclusionary clause to the duty to defend. Since in that event we test the meaning of the policy according to the insured's reasonable expectation of coverage and since the language of the policy would lead the insured here to expect defense of the third party suit, we cannot exonerate the carrier from the rendition of such protection.

Plaintiff, Dr. Vernon D. Gray, is the named insured under an insurance policy issued by defendant. A ''Comprehensive Personal Liability Endorsement'' in the policy states, under a paragraph designated ''Coverage L,'' that the insurer agrees '' [T] o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage, and the company shall defend any suit against the insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this endorsement, even if any of the allegations are groundless, false or fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient.'' The policy contains a provision that '' [T] his endorsement does not apply'' to a series of specified exclusions set forth under separate headings, including a paragraph (c) which reads, ''under coverages L and M, to bodily injury or property damages caused intentionally by or at the direction of the insured.''

The suit which Dr. Gray contends Zurich should have defended arose out of an altercation between him and a Mr. John R. Jones.[1] Jones filed a complaint in Missouri alleging that Dr. Gray ''wilfully, maliciously, brutally and intentionally assaulted'' him; he prayed for actual damages of $50,000 and punitive damages of $50,000. Dr. Gray notified defendant of the suit, stating that he had acted in self defense, and requested that the company defend. Defendant refused on the ground that the complaint alleged an intentional tort which fell outside the coverage of the policy. Dr. Gray thereafter unsuccessfully defended on the theory of self defense; he suffered a judgment of $6,000 actual damages although the jury refused to award punitive damages.

---

[1]Immediately preceding the altercation Dr. Gray had been driving an automobile on a residential street when another automobile narrowly missed colliding with his car. Jones, the driver of the other car, left his vehicle, approached Dr. Gray's car in a menacing manner and jerked open the door. At that point Dr. Gray, fearing physical harm to himself and his passengers, rose from his seat and struck Jones.

Dr. Gray then filed the instant action charging defendant with breach of its duty to defend. Defendant answered, admitting the execution of the policy but denying any such obligation. The record on appeal has been augmented to include an offer of proof, presented by plaintiff and rejected by the trial court, which detailed the circumstances surrounding the altercation. The augmented record also includes exhibits introduced at the trial, consisting of copies of the pleadings and verdict in the Missouri suit and a copy of the subject insurance policy. The parties waived written findings of fact and conclusions of law; the court rendered judgment in favor of defendant. We must decide whether or not defendant bore the obligation to defend plaintiff in the Missouri action.

Defendant argues that it need not defend an action in which the complaint reveals on its face that the claimed bodily injury does not fall within the indemnification coverage;[2] that here the Jones complaint alleged that the insured committed an assault, which fell outside such coverage. Defendant urges, as a second answer to plaintiff's contention, that the contract, if construed to require defense of the insured, would violate the public policy of the state and that, indeed, the judgment in the third party suit upholding the claim of an intentional bodily injury operates to estop the insured from recovery. Defendant thirdly contends that any requirement that it defend the Jones suit would embroil it in a hopeless conflict of interest. Finally it submits that, even if it should have defended the third party suit, the damages against it should encompass only the insured's expenses of defense and not the judgment against him.

We shall explain our reasons for concluding that defendant was obligated to defend the Jones suit, and our grounds for rejecting defendant's remaining propositions. Since the policy sets forth the duty to defend as a primary one and since the insurer attempts to avoid it only by an unclear exclusionary clause, the insured would reasonably expect, and is legally entitled to, such protection. As an alternative but secondary ground for our ruling we accept, for purposes of argument, defendant's contention that the duty to defend arises only if the third party suit involves a liability for which the insurer would be required to indemnify the insured, and, even upon this basis, we find a duty to defend.

---

[2]Defendant relies upon such cases as *Greer-Robbins Co.* v. *Pacific Surety Co.* (1918) 37 Cal.App. 540 [174 P. 110]; *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624 [40 P.2d 311]; *Ritchie* v. *Anchor Casualty Co.* (1955) 135 Cal.App.2d 245 [286 P.2d 1000].

■ In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.[3]

· These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract. ■ As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a "take it or leave it" basis carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.[4]

Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them,[5] they have also applied the doctrine of the adhesion contract to insurance

---

[3]Typical of the legion of cases so holding is *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914], which states: "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. [Citations.] If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured." See the numerous cases to the same effect collected in 13 Appleman, Insurance Law and Practice, § 7401 et seq.; 1 Couch, Insurance, § 15:73 et seq.; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 224, pp. 252-253, supplemented in 1965 Supp. pp. 68-70.

[4]*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284]; *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.2d 693]; *Lagomarsino* v. *San Jose etc. Title Ins. Co.* (1960) 178 Cal.App.2d 455, 464 [3 Cal. Rptr. 80]; *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 695 [10 Cal.Rptr. 781]; see these cases for reference to commentators and decisions developing the doctrine of the adhesion contract.

[5]The traditional rules of construction for contracts require the courts to take cognizance of the expectations of the parties. "If the court is convinced that it knows the purposes of the parties, the intended legal result, however vaguely expressed and poorly analyzed, it should be loath to adopt any interpretation of their language that would produce a different result." (3 Corbin on Contracts, p. 164.)

policies, holding that in view of the disparate bargaining status of the parties[6] we must ascertain that meaning of the contract which the insured would reasonably expect.[7]

■ Thus as Kessler stated in his classic article on adhesion contracts: "In dealing with standardized contracts courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's 'calling', and to what extent the stronger party disappointed reasonable expectations based on the typical life situation." (Kessler, *Contracts of Adhesion* (1943) 43 Colum.L.Rev. 629, 637.)

---

[6]Isaacs, *The Standardizing of Contracts* (1917) 27 Yale L.J. 34, in an early analysis, suggests the basis for the adhesion contract, pointing out that standardized contracts create "status" relationships as opposed to individualized relationships. The article states: "The movement toward status law clashes, of course, with the ideal of individual freedom in the negative sense of 'absence of restraint' or *laissez faire*. Yet, freedom in the positive sense of presence of opportunity is being served by social interference with contract. There is still much to be gained by the further standardizing of the relations in which society has an interest, in order to remove them from the control of the accident of power in individual bargaining. The new school of jurisprudence has a great work before it in educating the courts. It must, indeed, dispel the fear of status as an archaic legal institution which we have outgrown." (At p. 47.) Pound, The Spirit of Common Law (1921) states: "Taking no account of legislative [i.e., non-common law] limitations upon freedom of contract, in the purely judicial development of our law we have taken the law of insurance practically out of the category of contract, and we have established that the duties of public service companies are not contractual, as the nineteenth century sought to make them, but are instead relational; they do not flow from agreements which the public servant may make as he chooses, they flow from the calling in which he has engaged and his consequent relation to the public." (At p. 29.)

[7]Courts have long applied the doctrine of reasonable expectation to the interpretation of insurance contracts. Thus in *Coast Mutual B.-L. Assn.* v. *Security T. I. & G. Co.* (1936) 14 Cal.App.2d 225, 229 [57 P.2d 1392], the court said: "In the decision of this question we are to be guided by well-established rules relating to the construction of insurance policies. Not only the provisions of the policy as a whole, but also the exceptions to the liability of the insurer, *must be construed so as to give the insured the protection which he reasonably had a right to expect*, and to that end doubts, ambiguities, and uncertainties arising out of the language used in the policy must be resolved in his favor." (Italics added.) *Atlantic Nat. Ins. Co.* v. *Armstrong* (1966) *ante*, p. 100 [52 Cal.Rptr. 569, 416 P.2d 801], is a recent example of the application of the doctrine. We there recognized that the insured would not have reasonably expected a policy provision requiring him to indemnify his insurer for a risk not covered by the policy but which was required by law to be contained in all such policies. In holding the provision therefore unenforceable we said: "In interpreting an insurance contract we must consider the intent and reasonable expectations of the parties in entering into the agreement. Hence, we must evaluate not only [the insurer's] contract form, but also [the insured's] knowledge and understanding as a layman and *his normal expectation of the extent of coverage of the policy.*" (Italics added.) (*Id.* at p. 112.)

Professor Patterson, in describing one characteristic conse-
quence of ''the conception of adhesion, whether that term is
used or not,'' writes: ''The court interprets the form contract
to mean what a reasonable buyer would expect it to mean, and
thus protects the weaker party's expectation at the expense of
the stronger's. This process of interpretation was used many
years ago in interpreting (or construing) insurance con-
tracts. . . .'' (Fn. omitted; Patterson, *The Interpretation
and Construction of Contracts* (1964) 64 Colum.L.Rev. 833,
858.)

Thus we held in *Steven* v. *Fidelity & Casualty Co., supra,*
58 Cal.2d 862, that we would not enforce an exclusionary
clause in an insurance contract which was unclear, saying:
''If [the insurer] deals with the public upon a mass basis, the
notice of noncoverage of the policy, in a situation in which the
public may reasonably expect coverage, must be conspicuous,
plain and clear.'' (P. 878.) [8]

When we test the instant policy by these principles
we find that its provisions as to the obligation to defend are
uncertain and undefined; in the light of the reasonable expec-
tation of the insured, they require the performance of that
duty. At the threshold we note that the nature of the obliga-
tion to defend is itself necessarily uncertain.[9] Although
insurers have often insisted that the duty arises only if the
insurer is bound to indemnify the insured, this very conten-
tion creates a dilemma. No one can determine whether the
third party suit does or does not fall within the indemnifica-
tion coverage of the policy until that suit is resolved; in the
instant case, the determination of whether the insured engaged

---

[8]In *Steven* we relied upon the early California case of *Raulet* v. *North-
western etc. Ins. Co.* (1910) 157 Cal. 213 [107 P. 292], which aptly said:
''It is a matter almost of common knowledge that a very small per-
centage of policyholders are actually cognizant of the provisions of their
policies and many of them are ignorant of the names of the companies
issuing the said policies. The policies are prepared by the experts of the
companies, they are highly technical in their phraseology, they are com-
plicated and voluminous—the one before us covering thirteen pages of
the transcript—and in their numerous conditions and stipulations fur-
nishing what sometimes may be veritable traps for the unwary.'' (At
p. 230.)

[9]As to the difficulties inherent in determining when the insured is
entitled to defense by his insurer, see generally: Comment, *The Insurer's
Duty to Defend Under a Liability Insurance Policy* (1966) 114 U.Pa.
L.Rev. 734; Note, *Insurance Company's Dilemma: Defending Actions
Against the Assured* (1950) 2 Stan.L.Rev. 383; Roos, *The Obligation to
Defend and Some Related Problems* (1961) 13 Hastings L.J. 206; and
Note, *Insurer's Duty to Defend Expanded by Construction of Exclusion
Clause* (1961) 49 Cal.L.Rev. 394.

in intentional, negligent or even wrongful conduct depended upon the judgment in the Jones suit, and, indeed, even after that judgment, no one could be positive whether it rested upon a finding of plaintiff's negligent or his intentional conduct. The carrier's obligation to indemnify inevitably will not be defined until the adjudication of the very action which it should have defended. Hence the policy contains its own seeds of uncertainty; the insurer has held out a promise that by its very nature is ambiguous.

Although this uncertainty in the performance of the duty to defend could have been clarified by the language of the policy we find no such specificity here.[10] An examination of the policy discloses that the broadly stated promise to defend is not conspicuously or clearly conditioned solely on a nonintentional bodily injury; instead, the insured could reasonably expect such protection.

■ The policy is a "comprehensive personal liability" contract; the designation in itself connotes general protection for alleged bodily injury caused by the insured. The insurer makes two wide promises: "[1.] To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage, and [2.] the company shall defend any suit against the insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this endorsement, even if any of the allegations of the suit are groundless, false, or fraudulent": clearly these promises, without further clarification, would lead the insured reasonably to expect the insurer to defend him against suits seeking damages for bodily injury, whatever the alleged cause of the injury, whether intentional or inadvertent.

But the insurer argues that the third party suit must seek "damages which are *payable* under the terms of this endorsement"; it contends that this limitation *modifies* the general duty to defend by confining the duty only to actions seeking

---

[10]Thus the subject policy affords no clear answer to the following queries: Does the carrier exercise the sole right to determine whether the "suit against the insured alleging such bodily injury" was "caused intentionally by the insured?" When, and under what circumstances, is such determination binding upon the insured? Does the carrier exercise the exclusive power to decide whether "the allegations of the suit are groundless, false, or fraudulent"? When and under what circumstances is such a determination binding upon the insured? Are these matters to be resolved by the pleadings in the third party suit, by the insured's presentation to the insurer of his version of the facts, by the insurer's own investigation of the facts, or by the judgment rendered in the third party suit?

damages within the primary coverage of the policy. Under "Exclusions" the policy provides that it "does not apply . . . under coverage L and M to bodily injury . . . caused intentionally by . . . the insured.'

The very first paragraph as to coverage, however, provides that "the company shall defend any such suit against the insured alleging such bodily injury" although the allegations of the suit are groundless, false or fraudulent. This language, in its broad sweep, would lead the insured reasonably to expect defense of *any* suit regardless of merit or cause. The relation of the exclusionary clause to this basic promise is anything but clear. The basic promise would support the insured's reasonable expectation that he had bought the rendition of legal services to defend against a suit for bodily injury which alleged he had caused it, negligently, nonintentionally, intentionally or in any other manner. ■ The doctrines and cases we have set forth tell us that the exclusionary clause must be "conspicuous, plain and clear." (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 878.) This clause is not "conspicuous" since it appears only after a long and complicated page of fine print, and is itself in fine print; its relation to the remaining clauses of the policy and its effect are surely not "plain and clear."

■ A further uncertainty lurks in the exclusionary clause itself. It alludes to damage caused "intentionally by or at the direction of the insured." Yet an act of the insured may carry out his "intention" and also cause unintended harm. When set next to the words "at the direction of the insured" the word "intentionally" might mean to the layman collusive, wilful or planned action beyond the classical notion of intentional tort.[11] This built-in ambiguity has caused debate and refined definition in many courts;[12] in any event, the word surely cannot be "plain and clear" to the layman.

The insured is unhappily surrounded by concentric circles of uncertainty: the first, the unascertainable nature of the

---

[11]Thus Prosser points out: "The defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent and if the risk is great his conduct may be characterized as reckless or wanton, but it is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree." (Prosser, Law of Torts (3d ed. 1965) p. 32.)

[12]Thus a number of cases have recognized that an act which under the traditional terminology of the law of torts is denominated "intentional" or "wilful" does not necessarily fall outside insurance coverage. (*Firco, Inc.* v. *Fireman's Fund Ins. Co.* (1959) 173 Cal.App.2d 524 [343 P.2d 311]; *Meyer* v. *Pacific Employers Ins. Co.* (1965) 233 Cal.App.2d 321

insurer's duty to defend; the second, the unknown effect of the provision that the insurer must defend even a groundless, false or fraudulent claim; the third, the uncertain extent of the indemnification coverage. Since we must resolve uncertainties in favor of the insured and interpret the policy provisions according to the layman's reasonable expectations,[13] and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that such obligation is independent of the indemnification coverage.

The insurer counters with the contention that this position would compel an insurer "issuing a policy covering liability of the insured for maintenance, use or operation of an automobile . . . to defend the insured in an action for damages for negligently maintaining a stairway and thereby allegedly causing injury to another—because the insured claims that the suit for damages was false or groundless." The "groundless, false, or fraudulent" clause, however, does not extend the obligation to defend without limits; it includes only defense to those actions of the nature and kind covered by the policy. Here the policy insures against "damages because of bodily injury." As we have pointed out, in view of the language of the policy, the insured would reasonably expect protection in an action involving alleged bodily injury. On the other hand the insured could not reasonably expect protection under an automobile insurance policy for injury which occurs from defect in a stairway. Similarly an insured would not expect a

[43 Cal.Rptr. 542]; *Walters* v. *American Ins. Co.* (1960) 185 Cal.App.2d 776 [8 Cal.Rptr. 665]; *Capachi* v. *Glens Falls Ins. Co.* (1963) 215 Cal. App.2d Supp. 843 [30 Cal.Rptr. 323]; *Putman* v. *Zeluff* (1964) 372 Mich. 553 [127 N.W.2d 374]; see also *Smith* v. *Moran* (1965) 61 Ill.App.2d 157 [209 N.E.2d 18]; Quint, *"Wilful Misconduct," "Wanton and Reckless Misconduct," "Gross Negligence"* (1965) 40 State Bar J. 481.)

[13]Courts have recognized the application of the reasonable expectation doctrine to a policy of insurance which sought to distinguish between intentional and accidental conduct. In *Meyer* v. *Pacific Employers Ins. Co., supra,* 233 Cal.App.2d 321, a policy covered "injury to or destruction of property . . . unless caused by accident." (P. 324.) In a third party suit the plaintiff claimed that the insured's well drilling operations resulted in property damage; the trial court there found that the insured " 'intentionally caused an indirect trespass. . . .' " (P. 323.) Reasoning that the consequent damages were not "intentional" and were "not expected," the appellate court held the damages "accidental in character" (p. 327) and covered by the policy. The court said, "A policy of insurance should not be so interpreted as to remove from the coverage of the policy a risk against which the circumstances under which and the purposes for which the policy was written indicate the insured *intended* to protect himself, unless such an interpretation is compelled by the express and unambiguous language of the policy." (Pp. 327-328; italics added.)

defense for an injury involving an automobile under a general comprehensive policy which excluded automobile coverage. ■ We look to the nature and kind of risk covered by the policy as a limitation upon the duty to defend; we cannot absolve the carrier from the duty to defend an insured for loss of the nature and kind against which it insured.[14]

Our holding that the insurer bore the obligation to defend because the policy led plaintiff reasonably to expect such defense, and because the insurer's exclusionary clause did not exonerate it, cuts across defendant's answering contention that the duty arises only if the pleadings disclose a cause of action for which the insurer must indemnify the insured. Defendant would equate the duty to defend with the complaint that pleaded a liability for which the insurer was bound to indemnify the insured. Yet even if we accept defendant's premises, and define the duty to defend by measuring the allegations in the Jones case against the carrier's liability to indemnify, defendant's position still fails. We proceed to discuss this alternative ground of liability of the insurer, accepting for such purpose the insurer's argument that we must test the third party suit against the indemnification coverage of the policy. ■ We point out that the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy; the Jones action was such a suit.[15]

---

[14]"As to the insured's expectations, it is safe to assume that if the ordinary insurance consumer had thought about them, his expectations would be that the insurer would defend him whenever there was a threat of liability to him and the threat was based on facts within the policy. The insured probably would be surprised at the suggestion that defense coverage might turn on the pleading rules of the court that a third party chose or on how the third party's attorney decided to write the complaint. In some cases the insured might think in terms of his own conduct. The bar owner, for example, might well think that he is insulated from any legal expense arising from injuries to patrons so long as he personally does not intentionally injure someone or tell an employee to do so. To him the possibility of an ambitious claimant who would begin a lawsuit with a charge of an intentional injury for the sake of a favorable bargaining position and later be willing to abandon that charge for one of simple negligence might not occur; or if the possibility did occur the insured might not pause to consider whether it would be fatal to part of his insurance coverage. In short, the limits of the phrase 'suits alleging such injury,' prepared by lawyers, defended by lawyers and authoritatively interpreted by lawyers, are probably not appreciated by the lay insured. And even the more sophisticated insured has no choice in the matter, since the provision is standard." (Comment, *supra*, 114 U.Pa.L. Rev. 734, 748 [fn. omitted].)

[15]"[M]odern procedure has made for so much greater flexibility or plasticity in pleading that this rule must be applied with extreme care to include all the *potentialities* of the pleading and the policy coverage, . . ." (Italics added.) (*Columbia Southern Chemical Corp.* v. *Manufacturers &*

Defendant cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable. Although an earlier decision reads: ''In determining whether or not the appellant was bound to defend . . . the language of its contract must first be looked to, and next, the allegations of the complaints . . .'' (*Lamb* v. *Belt Casualty Co.*, *supra*, 3 Cal.App. 2d 624, 630), courts do not examine only the pleaded word but the potential liability created by the suit. ▆▆▆ Since the instant action presented the potentiality of a judgment based upon nonintentional conduct, and since liability for such conduct would fall within the indemnification coverage, the duty to defend became manifest at the outset.

To restrict the defense obligation of the insurer to the precise language of the pleading would not only ignore the thrust of the cases but would create an anomaly for the insured. Obviously, as *Ritchie* v. *Anchor Casualty Co.*, *supra*, 135 Cal.App.2d 245, points out, the complainant in the third party action drafts his complaint in the broadest terms; he may very well stretch the action which lies in only nonintentional conduct to the dramatic complaint that alleges intentional misconduct. In light of the likely overstatement of the complaint and of the plasticity of modern pleading, we should hardly designate the third party as the arbiter of the policy's coverage.

▆▆▆ Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever

*Wholesalers Indem. Exch.* (1961) 190 Cal.App.2d 194, 200 [11 Cal.Rptr. 762].) ''And the ultimate question is whether the *facts* alleged do fairly apprise the insurer that plaintiff is suing the insured upon an occurrence which, if his allegations are true, gives rise to liability of insurer to insured under the terms of the policy.'' (Italics added.) (*Ritchie* v. *Anchor Casualty Co.*, *supra*, 135 Cal.App.2d 245, 251. See also, e.g., *Firco, Inc.* v. *Fireman's Fund Ins. Co.*, *supra*, 173 Cal.App.2d 524, 527-529. To the same effect, *Karpe* v. *Great American Indem. Co.* (1961) 190 Cal.App.2d 226, 234 [11 Cal.Rptr. 908]; *Capachi* v. *Glens Falls Ins. Co.*, *supra*, 215 Cal.App.2d Supp. 843; *Journal Pub. Co.* v. *General Cas. Co.* (1954) 210 F.2d 202, 209.) The corollary of the above rulings finds expression in the cases which hold that the insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage. Hence the obligation to defend does not mature if the policy was not in force at the time of the alleged occurrence (*Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal. App.2d 84 [295 P.2d 19, 57 A.L.R.2d 1379]) or if the nature of the alleged intentional tort compels a finding of intentional wrongdoing such as malicious prosecution. (*Maxon* v. *Security Ins. Co.* (1963) 214 Cal. App.2d 603 [29 Cal.Rptr. 586].)

it ascertains facts which give rise to the potential of liability under the policy. In the instant case the complaint itself, as well as the facts known to the insurer, sufficiently apprised the insurer of these possibilities; hence we need not set out when and upon what other occasions the duty of the insurer to ascertain such possibilities otherwise arises.

Jones' complaint clearly presented the possibility that he might obtain damages that were covered by the indemnity provisions of the policy. Even conduct that is traditionally classified as "intentional" or "wilful" has been held to fall within indemnification coverage.[16] Moreover, despite Jones' pleading of intentional and wilful conduct, he could have amended his complaint to allege merely negligent conduct. Further, plaintiff might have been able to show that in physically defending himself, even if he exceeded the reasonable bounds of self-defense, he did not commit wilful and intended injury, but engaged only in nonintentional tortious conduct. Thus, even accepting the insurer's premise that it had no obligation to defend actions seeking damages not within the indemnification coverage, we find, upon proper measurement of the third party action against the insurer's liability to indemnify, it should have defended because the loss could have fallen within that liability.

We turn to the insurer's second major contention that the contract cannot be read to require the insurer to defend an action seeking damages for an intentional wrong because such an obligation would violate public policy. In support of this argument it relies upon Insurance Code section 533, and Civil Code section 1668.[17]

The contention fails on two grounds. In the first place, the statutes forbid only contracts which indemnify for *"loss"* or *"responsibility"* resulting from wilful wrongdoing. Here we deal with a contract which provides for *legal defense* against an action charging such conduct; the contract does not call for

[16]See cases collected in fn. 12, *supra.* As the court said in *Russ-Field Corp.* v. *Underwriters at Lloyd's* (1958) 164 Cal.App.2d 83, 96 [330 P.2d 432], "A 'wilful act' as used in this statute connotes something more blameworthy than the sort of misconduct involved in ordinary negligence, and something more than the mere intentional doing of an act constituting such negligence."

[17]Insurance Code section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

Civil Code section 1668 provides in relevant part: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own . . . willful injury to the person or property of another . . . are against the policy of the law."

indemnification of the insured if the third party plaintiff prevails. In the second place, as we pointed out in *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal. Rptr. 731, 394 P.2d 571], the statutes ''establish a public policy to prevent insurance coverage from encouragement of wilful tort.'' Thus *Tomerlin* held that if an insurer's obligation to pay a judgment based on wilful conduct results from an estoppel *after* the conduct, the obligation could not have previously encouraged the conduct. Similarly, the present contract does not offend the statute; a contract to defend an assured upon mere accusation of a wilful tort does not encourage such wilful conduct.

 Nor can we accept defendant's argument that the duty to defend dissolves simply because the insured is unsuccessful in his defense and because the injured party recovers on the basis of a finding of the assured's wilful conduct. Citing *Abbott* v. *Western Nat. Indem. Co.* (1958) 165 Cal. App.2d 302 [331 P.2d 997], the insurer urges that if the judgment in a third party suit goes against the insured it operates as ''res judicata or collateral estoppel in the insured's action or proceeding against the insurer.''

We have explained that the insured would reasonably expect a defense by the insurer in all personal injury actions against him. If he is to be required to finance his own defense and then, only if successful, hold the insurer to its promise by means of a second suit for reimbursement, we defeat the basic reason for the purchase of the insurance. In purchasing his insurance the insured would reasonably expect that he would stand a better chance of vindication if supported by the resources and expertise of his insurer than if compelled to handle and finance the presentation of his case. He would, moreover, expect to be able to avoid the time, uncertainty and capital outlay in finding and retaining an attorney of his own. ''The courts will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance.'' (*Ritchie* v. *Anchor Casualty Co., supra,* 135 Cal. App.2d 245, 257.)

 Similarly, we find no merit in the insurer's third contention that our holding will embroil it in a conflict of interests. According to the insurer our ruling will require defense of an action in which the interests of insurer and insured are so opposed as to nullify the insurer's fulfillment of its duty of defense and of the protection of its own interests. For example, the argument goes, if defendant had defended against the Jones suit it would have sought to estab-

lish either that the insured was free from any liability or that such liability rested on intentional conduct. The insured, of course, would also seek a verdict holding him not liable but, if found liable, would attempt to obtain a ruling that such liability emanated from the nonintentional conduct within his insurance coverage. Thus, defendant contends, an insurer, if obligated to defend in this situation, faces an insoluble ethical problem.

Since, however, the court in the third party suit does not adjudicate the issue of coverage, the insurer's argument collapses. The only question there litigated is the insured's *liability*. The alleged victim does not concern himself with the theory of liability; he desires only the largest possible judgment. Similarly, the insured and insurer seek only to avoid, or at least to minimize, the judgment. As we have noted, modern procedural rules focus on whether, on a given set of facts, the plaintiff, regardless of the theory, may recover. Thus the question of whether or not the insured engaged in intentional conduct does not normally formulate an issue which is resolved in that litigation.[18]

In any event, if the insurer adequately reserves its right to assert the noncoverage defense later, it will not be bound by the judgment. If the injured party prevails, that party or the insured will assert his claim against the insurer.[19] At this time the insurer can raise the noncoverage defense previously reserved. In this manner the interests of insured and insurer in defending against the injured party's primary suit will be identical; the insurer will not face the suggested dilemma.

Finally, defendant urges that our holding should require only the reimbursement of the insured's expenses in defending the third party action but not the payment of the judgment. Defendant acknowledges the general rule that an insurer that wrongfully refuses to defend is liable on the judgment against the insured. (*Arenson* v. *National Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816]; Civ. Code, § 2778.)

---

[18]In rare cases the issue of punitive damages or a special verdict might present a potential conflict of interests, but such a possibility does not outweigh the advantages of the general rule. Even in such cases, however, the insurer will still be bound, ethically and legally, to litigate in the interests of the insured.

[19]Insurance Code section 11580, subdivision (b)(2) provides that ''whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment.''

Defendant argues, however, that the instant situation should be distinguished from that case because here the judgment has not necessarily been rendered on a theory within the policy coverage. Thus defendant would limit the insured's recovery to the expenses of the third party suit.

We rejected a similar proposal in *Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, 649-650. In that case, as we have noted, the insurer's obligation to defend arose out of estoppel. The insurer contended that we should apply a "tort" theory of damages to its wrongful refusal to defend. Such a theory, we explained, would impose upon the insured "the impossible burden" of proving the extent of the loss caused by the insurer's breach. As this court said in an analogous situation in *Arenson* v. *National Auto. & Cas. Ins. Co.* (1957) 48 Cal.2d 528, 539 [310 P.2d 961] : "Having defaulted such agreement the company is manifestly bound to reimburse its insured for the full amount of any obligation reasonably incurred by him. It will not be allowed to defeat or whittle down its obligation on the theory that plaintiff himself was of such limited financial ability that he could not afford to employ able counsel, or to present every reasonable defense, or to carry his cause to the highest court having jurisdiction, . . . . Sustaining such a theory . . . would tend . . . to encourage insurance companies to similar disavowals of responsibility with everything to gain and nothing to lose."

In summary, the individual consumer in the highly organized and integrated society of today must necessarily rely upon institutions devoted to the public service to perform the basic functions which they undertake. At the same time the consumer does not occupy a sufficiently strong economic position to bargain with such institutions as to specific clauses of their contracts of performance, and, in any event, piecemeal negotiation would sacrifice the advantage of uniformity. Hence the courts in the field of insurance contracts have tended to require that the insurer render the basic insurance protection which it has held out to the insured. This obligation becomes especially manifest in the case in which the insurer has attempted to limit the principal coverage by an unclear exclusionary clause. We test the alleged limitation in the light of the insured's reasonable expectation of coverage; that test compels the indicated outcome of the present litigation.

The judgment is reversed and the trial court instructed to take evidence solely on the issue of damages alleged in plaintiff's complaint including the amount of the judgment in the

Jones suit, and the costs, expenses and attorney's fees incurred in defending such suit.

Traynor, C. J., Peters, J., Peek, J., Mosk, J., and Burke, J. concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Fox in the opinion prepared by him for the District Court of Appeal in *Gray* v. *Zurich Ins. Co.* (Cal.App.) 49 Cal.Rptr. 271.