[No. B206207. Second Dist., Div. Six. July 1, 2009.]

VENOCO, INC., Plaintiff and Appellant, v.
GULF UNDERWRITERS INSURANCE COMPANY, Defendant and
Respondent.

## COUNSEL

The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Morrison & Foerster, Miriam A. Vogel, David B. Babbe and James Oliva for Defendant and Respondent.

Wiley Rein, Laura A. Foggan; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and Mary E. Gregory for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

**GILBERT, P. J.**—An oil company has an insurance policy that excludes toxic pollution coverage. An exception to that exclusion applies under limited circumstances provided the oil company notifies the insurance company of a claim within 60 days of an occurrence. We conclude, among other things, this notice requirement does not violate public policy, nor is it barred by California's so-called "notice-prejudice" rule.

Plaintiff Venoco, Inc. (Venoco), appeals a summary judgment entered in favor of defendant Gulf. Underwriters Insurance Company (Gulf). Former students and employees of Beverly Hills High School brought an action against Venoco for personal injuries allegedly caused by toxic pollution from Venoco's oil and gas operations. Venoco sued Gulf, its insurer, seeking declaratory relief to establish Gulf's obligation to defend these actions.

We also conclude (1) the Gulf policy excludes the tort actions and alleged false claims filed against Venoco, (2) the 60-day reporting requirement is placed conspicuously in the policy, (3) the pollution exclusion supersedes inconsistent language in another portion of the policy. We affirm.

## FACTS

In 1910, oil wells were drilled on a 22-acre site that later would become Beverly Hills High School. In 1959, the high school district entered into an oil and gas lease with oil production companies. In the early 1980's, the oil companies built a new "consolidated production site" (the new site) next to the high school.

In 1995, the oil and gas lease for the new site was assigned to Venoco. Venoco processes crude oil and natural gas. It pumps the oil into a pipeline that connects to refineries in Long Beach. It removes the impurities from natural gas before it is pumped into distribution lines for homes and businesses.

In 1996, Venoco purchased a liability insurance policy from Gulf. The policy period was for one year, April 1, 1996, to April 1, 1997.

In February 2003, Venoco's general counsel, Gisele Goetz, learned from media reports that lawyers were reporting that Venoco's oil and gas operations were the source of dangerous toxic chemical pollution. This prompted her to write Venoco's insurance broker. Goetz wrote: "The law firm of Masry & Vittoe . . . has claimed that it represents up to 40 or more persons who are graduates of the Beverly Hills High School and who suffer from

various forms of cancer. Masry claims to have conducted tests on the High School premises which he asserts show high levels of some substances which he contends *would also have existed throughout the 1980's* when his plaintiffs were enrolled and which he speculates may have caused these cancers. . . . [¶] We currently own and operate an oil production facility near where these tests have been taken . . . ." (Italics added.)

Goetz said Masry informed Venoco that he intended to sue it, but Goetz noted that his claim for toxic contamination also extended to a period before Venoco operated the site. She said, "Although we did not own this facility during the time period in which [Masry's] clients would have gone to school, in an excess of caution, we wanted to alert you to the possibility of a toxic tort or personal injury or like claim by these plaintiffs against the facility/Venoco."

Several weeks later, numerous former students and employees of Beverly Hills High School filed lawsuits against Venoco. They alleged that they had been exposed to toxic chemicals from Venoco's well sites over extended periods while they were at the school. Plaintiff Ronald Zlotolaw said he attended the high school from 1993 to 1997. Plaintiff Marlene Mish said she worked there from 1976 to 2000. The plaintiffs claimed Venoco had so negligently conducted its operations that it had contaminated the high school with toxins and caused the plaintiffs to develop cancer and other serious illnesses. They claimed Venoco knew its business activities were causing these toxic chemical exposures, but it did not warn the public.

The plaintiffs also alleged that as a result of Venoco's oil and gas "production, storage and processing" (1) toxic chemical emissions "continue to be generated . . . and vented onto the Campus"; (2) those emissions include such dangerous chemicals as arsenic, barium, cadmium, chromium, lead, selenium, benzene, and radioactive materials; and (3) Venoco deposits dangerous waste materials into "wells and pits" on campus and has contaminated the surrounding communities' "air, soil, water and environment."

Venoco requested Gulf to provide a defense to these actions. Gulf declined and stated that there was a pollution exclusion in its policy. It said there was an exception to this exclusion in a pollution "buy-back" provision that allowed coverage for accidents. But the litigation against Venoco fell outside

the coverage requirements because Venoco had not proven (1) the claims stemmed from an accident caused by an unexpected intervening act, (2) the accident occurred on a specific date, (3) it discovered the accident within seven days, and (4) it notified Gulf within 60 days of discovery of an accident. Therefore, Venoco's claim was untimely.

Venoco sued Gulf for breach of contract and breach of the implied covenant of good faith and fair dealing, and sought declaratory relief. Venoco alleged that the suit brought against it involved its "business activities" for which it had insurance coverage.

Venoco filed a motion for summary adjudication against Gulf. Michael Edwards, a Venoco vice-president, declared that during Venoco's processing of oil and gas through various joints, valves and flanges, there are occasional emissions of "small amounts" of natural gas called "fugitive emissions." But "[t]he production and processing system at the site is closed—meaning it is not intended to release chemicals or other compounds to the environment." He said that at least five of the actions filed against Venoco and other defendants contained injury claims alleged to have occurred "during the term of Gulf's insurance coverage" with Venoco.

In turn, Gulf filed a motion for summary judgment. It claimed it had no duty to defend or indemnify Venoco for the type of litigation commenced against it. It noted that in Edwards's deposition he conceded that Venoco did not report any accidents or emissions to Gulf during the policy period that ended in 1997. Venoco had reported, however, some emissions to the air quality management district during that period. Gulf claimed, "Because it is undisputed that Venoco never gave any notice of any occurrence to Gulf during the effective period of the Gulf Policy or sixty days thereafter, Venoco has not satisfied the conditions of the Buy-Back Clause."

In Venoco's opposition, William Wineland, Venoco's former chief financial officer, declared, "I knew that 'pollution' exclusions were common in general liability policies at that time, but I understood that endorsements could be purchased from some insurers that would buy back pollution coverage." He said Venoco utilized two insurance brokers to negotiate with Gulf for the pollution buy-back provision. Wineland did not see the "actual policy documents" before he bought the coverage, but he expected it "would include pollution coverage." He noted that Venoco's previous insurer, St. Paul Surplus Lines Insurance Company, refused to extend coverage because of "the pollution risk associated with a crude oil pipeline . . . ."

The trial court denied Venoco's motion and granted Gulf's motion. The court ruled, "[I]t is undisputed that Venoco did not comply with the 60-day notice" requirement of the buy-back provision. The court found that the toxic contamination claims against Venoco were "alleged to have taken place over a period of years." Venoco did not report any accidents to Gulf within the 60-day period, it did not claim or prove that it was aware of any accidents as defined in the buy-back provision, and the 60-day requirement was not "unusual or unfair."

## DISCUSSION

### I. *Introduction*

The tort liability claims against Venoco fall outside the pollution coverage provisions in Gulf's insurance policy.

"[I]n interpreting an insurance policy, we seek to discern the mutual intention of the parties and, where possible, to infer this intent from the terms of the policy." (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381].) "When interpreting a policy provision, we give its words their ordinary and popular sense except where they are used by the parties in a technical or other special sense." (*Ibid.*)

On an appeal from a summary judgment, we conduct a de novo review of the record and the coverage provisions of the insurance policy. (*Travelers Casualty & Surety Co. v. Transcontinental Ins. Co.* (2004) 122 Cal.App.4th 949, 955 [19 Cal.Rptr.3d 272].) "Issues concerning the proper interpretation and application of language in an insurance policy are questions of law . . . ." (*Ibid.*)

### The Pollution Exclusion

The policy provides, in relevant part: "[I]t is hereby understood and agreed that this policy is subject to the following exclusions and that this policy shall not apply to: [¶] . . . [¶] (7) SEEPAGE, POLLUTION AND CONTAMINA-TION [¶] Liability for any bodily and/or personal injury to or illness or death of any person or loss of, damage to, or loss of use of property directly or indirectly caused by or arising out of seepage into or onto and/or pollution and/or contamination of air, land, water, and/or any other property and/or person irrespective of the cause of the seepage and/or pollution and/or contamination, and whenever occurring."

### The Pollution Buy-back Provision

The "seepage and pollution buy-back" provision provides, in relevant part:

"Notwithstanding the seepage and pollution exclusion contained in this policy, these shall not apply provided that the Insured establish that all of the following conditions have been met:

"A. The occurrence was accidental and was neither expected nor intended by the Insured. An accident shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Insured.

"B. The occurrence can be identified as commencing at a specified time and date during the terms of this policy.

"C. *The occurrence became known to the Insured within 7 days after its commencement and was reported to Insurers within 60 days thereafter.*

"D. The occurrence did not result from the Insured's intentional or wilful violation of any government statute, rule or regulation." (Italics added.)

Venoco sued Gulf claiming that it had filed a timely claim for coverage. But it did not specifically allege that it had complied with the pollution buy-back provision's 60-day reporting requirement. Venoco's one-year policy with Gulf expired on April 1, 1997. Venoco first made a claim in 2003, six years after the end of the policy period. Gulf denied coverage stating that Venoco did not assert that there was an accident nor did it report one within the 60-day period.

## II.  *The 60-day Reporting Requirement*

Venoco contends the 60-day reporting requirement is invalid because it is hidden in the policy and Gulf's reliance on that reporting deadline is unreasonable and against public policy.

■  "[T]o be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.'" (*Haynes v. Farmers Ins. Exchange, supra*, 32 Cal.4th at p. 1204.) "[A]ny such limitation must be placed and printed so that it will attract the reader's attention." (*Ibid.*) Courts have found coverage exclusions in policies not to be conspicuous where they were "hidden," or placed on "an overcrowded page" that readers could easily overlook. (*Cal-Farm Ins. Co. v. TAC Exterminators, Inc.* (1985) 172 Cal.App.3d 564, 577 [218 Cal.Rptr. 407].)

Here the pollution buy-back provision contains the relevant time-reporting limit on a separate page of the policy. On that page, part C states: "*The*

*occurrence became known to the Insured within 7 days after its commence-ment and was reported to Insurers within 60 days thereafter.*" (Italics added.) This clause is not hidden in fine print nor placed in an unusual part of the policy. Part C, along with parts A, B and D, is included as one of the mandatory conditions that trigger the application of the pollution buy-back provision. Part C stands out as a separate paragraph and is clear and explicit. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

■ Venoco claims the time limits are not highlighted. But a policy provision may be conspicuous without being in boldface. (*National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 384–385 [131 Cal.Rptr. 42, 551 P.2d 362].) Yet, as Gulf notes, the pollution buy-back provision contains a boldfaced heading that is phrased as a time-limit clause: "SEEPAGE AND POLLUTION BUY-BACK 7 DAY CLAUSE (LAND BASED OPERATIONS)."

Pollution buy-back provisions containing reporting time limits are not unusual in the oil industry. (See, e.g., *Matador Petroleum v. St. Paul Surplus Lines Ins.* (5th Cir. 1999) 174 F.3d 653, 656–657; *Certain Underwriters at Lloyd's v. C.A. Turner Const.* (5th Cir. 1997) 112 F.3d 184, 189.) Venoco had obtained prior insurance for its oil production. Those contracts also contained pollution buy-back provisions with reporting time limits. Venoco used two insurance brokers to negotiate with Gulf to purchase this pollution buy-back provision. Wineland knew pollution exclusions "were common" and that Venoco would have to obtain a special endorsement for the coverage it wanted. Venoco's suggestion that it did not know about the buy-back provision is undercut by Wineland's declaration that Venoco requested Gulf to add this provision.

■ Other courts have held that pollution buy-back provisions, like the one here, are clear and insurers may enforce their express reporting time limits. (*Matador Petroleum v. St. Paul Surplus Lines Ins., supra,* 174 F.3d at pp. 659–660; *Certain Underwriters at Lloyd's v. C.A. Turner Const., supra,* 112 F.3d at p. 189; *Clarendon America Ins. Co. v. Bay, Inc.* (S.D.Tex. 1998) 10 F.Supp.2d 736, 747–748 [buy-back provision not operable where claim was not made within the 30-day reporting period].)

### III.   *Is Proof of Prejudice Required to Enforce the 60-day Reporting Requirement?*

Venoco claims the 60-day reporting requirement is unenforceable because Gulf did not prove it would suffer substantial prejudice if notice were given later than 60 days.

■ "California's 'notice-prejudice' rule operates to bar insurance companies from disavowing coverage on the basis of lack of timely notice unless the insurance company can show actual prejudice from the delay." (*Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348, 1357 [270 Cal.Rptr. 779].) But this rule does not apply to every time limit on any insurance policy. (*Id.* at p. 1361.)

Where the policy provides that special coverage for a particular type of claim is conditioned on express compliance with a reporting requirement, the time limit is enforceable without proof of prejudice. (*Pacific Employers Ins. Co. v. Superior Court, supra*, 221 Cal.App.3d at pp. 1358–1361.) Such reporting time limits often are found in provisions for expanded liability coverage that the insurer usually does not cover. The insurer makes an exception and extends special coverage conditioned on compliance with a reporting requirement and other conditions. (*Certain Underwriters at Lloyd's v. C.A. Turner Const., supra*, 112 F.3d at p. 189.) The reporting requirement becomes "the written notice necessary to trigger the expanded coverage afforded" by the special policy provision. (*KPFF, Inc. v. California Union Ins. Co.* (1997) 56 Cal.App.4th 963, 975 [66 Cal.Rptr.2d 36].) In other words, "a loss, which triggers coverage, does not occur until notice of the underlying claim is given." (*Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 888 [13 Cal.Rptr.2d 295].) "Although the result is coverage more restrictive than that provided by the basic types of professional liability insurance policies, '[a]n insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected.' " (*Pacific Employers Ins. Co.*, at p. 1359.)

Imposing the prejudice requirement that Venoco seeks would expand the reporting time limit and impermissibly alter its agreement with Gulf. In *Matador Petroleum v. St. Paul Surplus Lines Ins., supra*, 174 F.3d 653, the insurance policy contained a pollution exclusion. As here, the insurer in *Matador* also issued a limited endorsement to an oil company to cover accidents provided that the oil company reported them within 30 days. (*Id.* at pp. 655–656.) The court of appeals rejected the claim that the reporting time limit should be lengthened by imposing a proof of prejudice requirement: "The basic insurance contract between Matador and St. Paul did not include coverage for pollution. The endorsement provision supplemented the basic agreement and constituted additional bargained for coverage. *An extension of the notice period under the endorsement would expand this coverage and would expose St. Paul to a risk broader than the risk expressly insured against* in the policy. St. Paul and Matador are both sophisticated commercial parties . . . ." "[W]e see no reason to apply a prejudice requirement and not to hold the parties to the specific terms of their bargain." (*Id.* at p. 659, italics added.)

Here, as in *Matador*, the parties agreed to expanded coverage in the pollution buy-back provision. This provision creates a limited exception to the pollution exclusion. The 60-day reporting requirement is one of four conditions that Venoco agreed to, and must comply with, before the pollution buy-back provision is operable. (*Pacific Employers Ins. Co. v. Superior Court, supra,* 221 Cal.App.3d at p. 1359.) *Matador* is consistent with California precedent involving enforcement of negotiated special-coverage reporting time limits. (*Id.* at pp. 1358–1359.) Consequently, " 'the language of the "buy-back" clause is unambiguous and must be enforced according to its "plain meaning." ' " (*Certain Underwriters at Lloyd's v. C.A. Turner Const., supra,* 112 F.3d at p. 189.)

### Public Policy and Expansion of Reporting Time Limits

Venoco suggests that strict enforcement of this time limit is against public policy and courts have authority to extend coverage beyond the time limits set forth in the policy. But *Pacific Employers* rejected this contention. " 'If a court were to allow an extension of reporting time . . . , such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained.' " (*Pacific Employers Ins. Co. v. Superior Court, supra,* 221 Cal.App.3d at pp. 1358–1359.) " 'This extension of coverage, by the court, . . . in effect rewrites the contract between the two parties. This we cannot and will not do.' " (*Id.* at p. 1359.)

Moreover, circumstances here are not comparable to those where insureds were late in filing claims that otherwise met the coverage elements. The prejudice requirement prevents the insured forfeiting an otherwise valid claim. By contrast, compliance with the reporting requirement here is "an element of coverage." (*Helfand v. National Union Fire Ins. Co., supra,* 10 Cal.App.4th at p. 888.) The issue is whether the insured met the basic coverage requirements. (*Ibid.*) Applying a proof of prejudice requirement would both alter the coverage elements and be unfair to the insurer because it "would materially alter the insurer's risk." (*Ibid.*)

Venoco first notified Gulf in 2003 of a potential claim. This placed Gulf in the position of being subject to a surprise claim for coverage years after the policy had expired with no opportunity to plan for future risks and financial exposure.

As the trial court correctly noted, the buy-back provision here is analogous to claims made and reported policies (see *Pacific Employers Ins. Co. v. Superior Court, supra,* 221 Cal.App.3d at p. 1359) where time is of the essence. The insurer provides additional high-risk coverage for claims made within defined reporting time limits, thereby lowering the risks to itself. This

allows high-risk businesses, such as Venoco, to obtain coverage at a reasonable price that otherwise would be unavailable. (*Id.* at pp. 1359–1360.)

■ "Underwriters, secure in the fact that claims will not arise under the subject policy after its expiration or termination can underwrite a risk and compute premiums with greater certainty. An insurance company can establish its reserves without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of negligence." (*Pacific Employers Ins. Co. v. Superior Court, supra*, 221 Cal.App.3d at p. 1359.) "There are benefits to the insured as well" in making insurance more available and less expensive. (*Id.* at p. 1359.) Such insurance contract provisions are fair and do not contravene public policy. (*Id.* at pp. 1359–1360.)

## IV. Do the Pollution Tort Claims Fall Within the Pollution Buy-back Provision?

Apart from the 60-day reporting requirement, there were three other mandatory conditions to establish coverage under the pollution buy-back provision: (1) the event is an unintended and unexpected accident; (2) this accident can be identified as commencing at a specific time and date; and (3) the accident is not the result of an intentional violation of a government statute, rule or regulation.

Venoco's complaint for breach of contract and declaratory relief against Gulf did not allege a specific cause of action under the pollution buy-back provision for an accident that had occurred at a specified time and date.

The *Yeshoua* action against Venoco (*Yeshoua v. Venoco, Inc.* (Super. Ct. L.A. County, No. BC300164)) was based on the claim there was a continuous "migration" of toxic chemicals from the drill sites to the high school that had occurred over a span of four decades. The plaintiffs alleged that they developed cancer and other illnesses because of long-term exposure to the chemicals while they worked at or attended the school. For example, plaintiff Zlotolaw claimed he attended the high school from 1993 to 1997, and plaintiff Mish said she worked there from 1976 to 2000.

In the *Steiner* action (*Steiner v. Venoco, Inc.* (Super. Ct. L.A. County, 2004, No. BC315885)), the plaintiffs alleged that Venoco and other defendants, "through *their own business operations* and activities, have caused . . . the release of toxic chemicals, which has resulted in the contamination of the Beverly Hills High School campus . . . ." (Italics added.) They claimed that the contamination was an ongoing, continuous release of toxic chemicals "on a daily basis." They did not allege a specific accident, but instead a

continuous business operation practice that resulted in releasing toxic substances. As the trial court correctly noted, Venoco did not identify a single accident the plaintiffs alleged was the cause of their injuries.

■ Buy-back provisions do not cover damage claims for long-term toxic exposure. Such claims are excluded by express language in the policy. (*Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1480–1481 [42 Cal.Rptr.2d 101] [no duty to defend claim on contamination caused by an accumulation of petroleum products because of absolute pollution exclusion]; *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1788 [22 Cal.Rptr.2d 206] [long-term pollution liability claim was not covered because of standard pollution exclusion]; *Truck Ins. Exchange v. Pozzuoli* (1993) 17 Cal.App.4th 856, 858–859 [21 Cal.Rptr.2d 650] [standard pollution exclusion does not authorize coverage for liability for long-term contamination]; *American States Ins. Co. v. Sacramento Plating, Inc.* (E.D.Cal. 1994) 861 F.Supp. 964, 970 [no duty to defend soil contamination liability claim where chemical spills had occasionally occurred during electroplating procedures]; see also *Northern Ins. Co. v. Aardvark Associates* (3d Cir. 1991) 942 F.2d 189, 194 [standard pollution exclusion "generally excludes coverage for injury or damage arising from pollution"]; *Quadrant Corp. v. American States Ins. Co.* (2005) 154 Wn.2d 165 [110 P.3d 733, 738] ["a majority of courts has concluded that absolute pollution exclusions unambiguously exclude coverage for damages caused by the release of toxic fumes"].)

Here the pollution exclusion is clear. It provides no coverage for injuries "directly or indirectly caused by or arising out of *seepage into or onto and/or pollution and/or contamination of air, land, water* . . . ." (Italics added.) Gulf and Venoco note that at least one appellate panel within our district has reviewed the scope of this exclusion.[1]

## V. Claims Against Venoco About Failure to Warn the Public

Venoco points out that the plaintiffs alleged it failed to give notice to the public about toxic chemical discharges. Venoco argues that this is an independent and unrelated liability claim that does not involve its release of toxic chemicals. It claims this notice liability claim is covered because it is not expressly mentioned as an exclusion in the pollution exclusion clause.

---

[1] The parties requested we take judicial notice of an unpublished decision by our colleagues in Division Four, *Beverly Hills Unified School Dist. v. Gulf Underwriters Ins. Co.* (Feb. 16, 2007, B188322). We read it. Its reasoning is impeccable. Too bad we cannot cite it.

This liability claim is not independent from allegations of pollution discharge. The plaintiffs alleged that Venoco had released toxic chemicals *and* had failed to give notice about the danger. In the *Steiner* action, the plaintiffs claimed Venoco knew its "business activities and the toxic chemicals [it] handled and disposed of were dangerous to human life and health." They said Venoco "oppressively failed to disclose . . . and . . . warn the public . . . . As a result of . . . [its] conduct, Plaintiffs and Plaintiffs' Decedents have suffered severe personal injuries and death."

The pollution exclusion is broad and absolute, excluding all claims for personal injuries *"directly or indirectly* . . . arising out of seepage . . . pollution and/or contamination . . . ."* (Italics added; see *Legarra v. Federated Mutual Ins. Co., supra,* 35 Cal.App.4th at p. 1480.) To limit the scope of this exclusion in the manner Venoco suggests would conflict with the language and purpose of this exclusive provision. (*Northern Ins. Co. v. Aardvark Associates, supra,* 942 F.2d at p. 194 ["The clause unambiguously withholds coverage for injury . . . 'arising out of *the* discharge . . .' of pollutants . . . , *not merely the insured's discharge* . . . 'of pollutants.' " (italics added)]; *USF & G v. George W. Whitesides Co., Inc.* (6th Cir. 1991) 932 F.2d 1169, 1171 [pollution exclusion clause applies broadly to all claims relating to the release of toxic chemicals even where the insured did not directly release the contaminants].)

■ Courts have held that these pollution exclusions also preclude coverage for claims involving the failure to disclose the existence of pollution, even in cases where the insureds were not polluters. (*James River Ins. Co. v. Ground Down Engineering, Inc.* (11th Cir. 2008) 540 F.3d 1270, 1276; *U.S. Fidelity & Guar. Co. v. Korman Corp.* (E.D.Pa. 1988) 693 F.Supp. 253, 258; see also *U.S. Industries, Inc. v. Ins. Co. of N. Am.* (1996) 110 Ohio App. 3d 361 [674 N.E.2d 414, 417–418] [claim that insured dumped waste and failed to disclose it was not covered].)

Here the liability for failure to warn is interwoven with, and directly connected to, the toxic exposure liability claim. Venoco is alleged to be responsible for the toxic pollution. Given the allegations in the plaintiffs' complaints, the policy excludes coverage for tort liability for Venoco's alleged failure to warn about its release of toxic chemicals.

### VI. *Duty to Defend False or Groundless Tort Claims*

Venoco contends that the policy contains a separate provision that requires Gulf to defend it from false or groundless claims. It argues that the actions

filed against it will fail because Venoco's "small emissions of natural gas" are "not toxic." It claims it could not have caused the illnesses the plaintiffs alleged, and consequently Gulf has a duty to provide a defense to these groundless actions. We disagree.

The policy provision in question provides, in relevant part, "The company will pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of [¶] A. bodily injury or [¶] B. property damage [¶] *to which this insurance applies*, . . . and the company shall have the right and duty to defend any suit . . . even if any of the allegations of the suit are groundless, false or fraudulent . . . ." (Italics added.)

In interpreting an insurance policy that contains a duty to defend a false claims provision, "we must resolve uncertainties in favor of the insured ∴ . . ." (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 274 [54 Cal.Rptr. 104, 419 P.2d 168].) But where the language of the provision is clear and limited, the courts may not expand it beyond its terms. (*Ibid.*) In *Gray*, the court determined that a false claims provision was qualified. It said, "The 'groundless, false, or fraudulent' clause, however, does not extend the obligation to defend without limits; it includes only defense to those actions of the nature and kind covered by the policy." (*Ibid.*)

Here, as in *Gray*, the duty to defend groundless actions applies only to claims covered by the policy. The phrase "*to which this insurance applies*" is not ambiguous. This qualified provision is not an agreement to defend all suits or to defend actions that fall outside the coverage provisions. (*Jaffe v. Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 936 [214 Cal.Rptr. 567].)

Moreover, Venoco could not reasonably expect that this false claims provision would override the policy's exclusion provisions, making them superfluous. It would force the insurer to defend all actions, regardless of coverage, where the insured simply asserted that the plaintiff's case was meritless. "We will not rewrite this policy to fasten on the insurer liability it did not assume and which the insured could not reasonably expect existed." (*Jaffe v. Cranford Ins. Co., supra*, 168 Cal.App.3d at p. 936.)

## VII. *Did the Preprinted Form Modify the Pollution Exclusion?*

Venoco contends there are two pollution exclusions in the Gulf policy. One is the pollution exclusion we have discussed. The other is an exclusion contained in a preprinted form in the policy that lists in fine print 17 general

coverage exclusions. Venoco argues that the policy's pollution exclusion is ambiguous because the language in the two exclusions is different.

Gulf concedes that there are two exclusions that are not identical. It acknowledges that one pollution exclusion provides what it refers to as "an *absolute* pollution exclusion," and the other pollution exclusion on the preprinted form contains a "*sudden and accidental*" exemption. This preprinted form provides that there is an exclusion for pollution claims, but "this exclusion does not apply if such discharge, dispersal, release or escape *is sudden and accidental.*" (Italics added.) Gulf claims the difference between these two exclusions is not relevant because Venoco did not rely, and could not reasonably rely, on the language in the preprinted form. Gulf is correct for a number of reasons.

First, Venoco's complaint did not allege that there were two inconsistent pollution exclusions or that it had relied on the preprinted form. Nor did it seek declaratory relief to resolve whether the preprinted form was an issue or whether it modified the pollution exclusion. In its discovery response to a separate statement of facts, Venoco indicated there were two pollution exclusions: (1) the pollution exclusion and (2) the pollution buy-back provision. It did not mention the preprinted form. Moreover, Wineland's declaration shows that the exclusion essential to Venoco was the pollution buy-back provision.

Second, the pollution exclusion is a special endorsement and, by its terms, governs and overrides the general provisions on the preprinted form. The introduction to the pollution exclusion states, "*Notwithstanding anything to the contrary contained in this policy*, it is hereby understood and agreed that this policy is subject to the following exclusions . . . ." (Italics added.)

Third, as a matter of law, the language of a special endorsement, such as the pollution exclusion, overrides the language in other parts of the policy in case of conflict. (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 50, fn. 4 [70 Cal.Rptr.2d 118, 948 P.2d 909].) "[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls." (*Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 431 [296 P.2d 801].) This is particularly the case where the conflicting language is contained in a preprinted form in the policy. The "specially prepared portions of a contract control over those which are printed or taken from a form." (*Ibid.*)

We have reviewed Venoco's remaining contentions and conclude that it has not shown reversible error.

The judgment is affirmed. Costs on appeal are awarded in favor of respondent.

Yegan, J., and Perren, J., concurred.