[Civ. No. 27846.   Second Dist., Div. One.   Sept. 11, 1964.]

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY
COMPANY, Plaintiff and Appellant, v. BROTHER-
HOOD OF RAILROAD TRAINMEN, W. L. SUNDER-
LAND et al., Defendants and Respondents.

(And Consolidated Cases.)

John J. Balluff, Richard K. Knowlton and C. George Nie-bank, Jr., for Plaintiff and Appellant.

Bodle & Fogel, George E. Bodle and Stephen Reinhardt for Defendants and Respondents.

LILLIE, J.—Santa Fe appeals from a judgment denying a petition to vacate three arbitration awards which sustained the claims of certain of its employees for an extra day's pay and confirming such awards.[1]  The arbitration proceedings were conducted pursuant to an agreement to arbitrate disputes arising from the interpretation and application of a collective bargaining agreement between Santa Fe's Coast Lines Division and the Brotherhood as the bargaining agent for the employees concerned.

The claimant-employees are "yardmen" belonging to "yard crews" employed by Santa Fe along its system.  Working with a yard or switching engine, these crews either move freight and passenger cars to a point where, as a train, they are picked up by "road crews" and taken to other destinations, or they break down strings of cars brought in by road crews and move them to designated points in the local area. Incident to the above duties, of course, is the coupling and uncoupling of cars, although (as presently to be noted) such was formerly not the case.  Since the advent of the air brake as the standard means of braking trains, the coupling function is commonly referred to in the jargon of railroad men as "tying up or untying the air."  Thus, at each end of the railroad car there is a flexible hose which may be joined to the hose on the adjacent car with a lock coupling device; after the hoses are properly joined from the locomotive to the last car, the air necessary to operate the brakes is then allowed to pass through an open valve and into the resulting continuous air line.  Formerly, as noted above, the coupling function was performed by employees not belonging to yard crews—for example, the conductor and brakeman on road crews.  The coupling function being considered an out-of-craft duty for yardmen and not free from hazards, its performance by them was made the basis for extra compensation following the resolution of the controversy in a 1951 landmark decision known as the Cheney Award.

Such extra compensation generally amounted to 95 cents a day subject to certain stated exceptions.  Provisions therefor, including the specific exceptions, are contained in article

---

[1]Actually there were three separate petitions to vacate three separate awards; the parties, however, have stipulated that the actions be consolidated for the purpose of this appeal, since they were considered together by the court below, and since the contentions in each instance are substantially the same.

12, section 2, of the instant bargaining agreement. The present controversy centers around these provisions, set forth below,[2] the substance of which is referred to in the briefs as the "air hose rule." In the Sunderland matter (see title of this appeal), the claims of the individual respondents for an extra day's pay were predicated on the following events, all occurring in one of the Los Angeles yards: The foreman of the crew (operating the switch engine) was instructed to get four cars from track 41 and put them onto track 22 where a train was being assembled or "made up." The foreman was also told that he was to couple the air on the cars which he took in with the cars already there "and pump up the train." With his helpers, "The air couplings were made on the entire train and the switch engine was used to pump up the air so the train would be ready to go." It was claimants' contention that the overall purpose of the above described work was to place these cars in a state of operational readiness for the pickup of the road crew; therefore, such air hose coupling was not necessary to the work of a yard crew or in preparation for further handling of the cars by them in that capacity.

The arbitration board, given the title Special Board of Adjustment,[3] sustained the claim of Sunderland and his

---

[2]Article 12, section 2: "When yardmen are required to couple and/or uncouple air hose subject to the exceptions listed below, each member of the ground crew will be paid an independent allowance of 95 cents regardless of which member or members of the crew perform the work; this allowance to be paid only once to a crew in the event the work is performed on more than one occasion during the day's work. The exceptions under which the independent allowance is not applicable and will not be paid are when yardmen are required to couple or uncouple air hose as follows:

"(A) Between engine and train
"(B) Between caboose and train
"(C) Between engine and caboose
"(D) Between cars when cutting or coupling up at crossings.

"It is further understood that yardmen will not be required to perform this work on cars other than those handled or to be handled by the engine with which they are working. The independent allowance specified herein shall be paid separate and apart from the work day and shall not be considered in arriving at overtime rate. (The 95-cent rate specified herein is subject to the conditions set forth in the Award of Referee Cheney dated August 1, 1951.)"

[3]The chairman, and neutral member, of this special board is a former justice of the Colorado Supreme Court whose vast experience in these matters seems not to be disputed.

helpers by its Award No. 306. In so doing, the board held that the case presented the same issues previously determined in Award No. 302, the claimants there being R. J. Wiley and his two helpers. In the latter, or key, case it was determined that "coupling air hose for the benefit of other crews was service outside [claimants'] assignment." It was further determined that, "The agreement of July 1, 1956 [that between the Brotherhood and Santa Fe] seems to limit rather than expand the use of yardmen in coupling air hose where car men are not available as it provides that they will not be required to perform this work on cars other than those handled or to be handled by the engine with which they are working."

The trial court took the view in a "Memorandum of Ruling" that the arbitrators were "attempting to reconcile a verbal formula (found in the contract) with an actual working practice which they 'knew' (rightly or wrongly) had been followed in the railroad yards; but which was not completely reflected in the verbal formula." Thereafter, among its formal conclusions of law the court concluded that "Under the federal substantive law governing labor arbitration and awards, the arbitrators herein were not bound to apply a literal interpretation of the provisions of the collective bargaining agreement, but could look to and did decide upon the basis of the 'common law of the shop.'" Further, "this Court is without authority to review the sufficiency of the evidence, or to reappraise any construction of the agreement implicit therein. Consequently, this court is without authority to determine whether or not the 'common law of the shop,' i.e., past practices, settlements and awards, actually supported the Award."

The above determinations and conclusions reflect the view that the trial court considered itself bound by the pronouncements in the *Steelworkers Cases,* the so-called "trilogy" being *United Steelworkers of America* v. *American Mfg. Co.,* 363 U.S. 564 [80 S.Ct. 1343, 4 L.Ed.2d 1403]; *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.,* 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409]; *United Steelworkers of America* v. *Enterprise Wheel & Car Co.,* 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424]. The decisional law of this state is in accord therewith. (*O'Malley* v. *Wilshire Oil Co.,* 59 Cal.2d 482 [30 Cal.Rptr. 452, 381 P.2d 188]; *Posner* v. *Grunwald-Marx, Inc.,* 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313].) ▮ Among the several pronouncements found in the above trilogy, the

following from *American Manufacturing* is preliminarily pertinent: "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his jugdment and all that it connotes that was bargained for." The court concluded: "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware." (363 U.S. at pp. 567-568.)

Santa Fe acknowledges that when the question of arbitrability is submitted to the courts, all doubts must be resolved in favor of arbitration—such is the clear holding in the statements just quoted. However, appellant asserts, the court still retains jurisdiction to determine whether the parties agreed "to give the arbitrator power to make the award he made." The quoted language is from the *Warrior* case where it is said: "Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." (363 U.S. 574, 582-583.) This brings us to Santa Fe's principal assignments of error. Contending that the provisions of the agreement are clear and unambiguous on their face, appellant argues that the award of the arbitrators went beyond the agreement as written and improperly applied a rule based on "the common law of the shop." Subsidiary to the above contention is the claim that courts are empowered to decide whether the arbitrators exceeded their authority by rendering an award which in effect "changes" the agreement, this being assertedly contrary to Clause F of the agreement to arbitrate

which provides that "The Board . . . shall not have authority to change existing agreements governing rates of pay, rules and working conditions."

It should be observed, at the outset of this discussion, that there is here no threshold question of arbitrability. Since the parties voluntarily agreed to arbitrate the present issue, appellant must show that the award exceeded the scope of the submission agreement. The precise question submitted being whether the several claimants were entitled to an extra day's pay for coupling air hose on cars thereafter to be handled by other crews, only one of two answers was possible. The claim would either be sustained or it would be denied. With that observation, we come to Santa Fe's contention, premising its first point on appeal, that the pertinent provisions of the bargaining agreement are clear and unambiguous; appellant so argues notwithstanding its agreement to submit the specific terminology to interpretation by the arbitrators. We cannot understand such argument because it is the law that "A contract is ambiguous when on its face it is capable of two different reasonable interpretations." (*Pedersen* v. *Fiksdal*, 185 Cal.App.2d 30, 34 [7 Cal. Rptr. 874].) Too, by contending below that the words "during the same shift" or "during the same day" should be read into the term "Handled or to be handled by the engine with which they are working," appellant in effect admits that the terminology on its face is not clear. Respondents, on the other hand, argued that the term "handled" should be read in light of the work assignment rule. They pointed out that it is not always necessary for yardmen to utilize air brakes for normal switching operations—for example, while the switching is done in a level yard. The opposite is the case, however, when (as here) they are called upon to couple air hose on cars to be taken out on its run by a road crew. The latter construction, by no means unreasonable, having been adopted by the arbitrators, appellant's premise is a false one.

However, says appellant, the trial court also erred in applying a rule based on the "common law of the shop" in view of its asserted failure to decide whether the air hose rule was in fact clear on its face. But implicit in its resort to the above "common law" was the court's determination that the rule in question was not free from ambiguity. Thereafter the trial court was called upon to decide whether the arbitrators' action in considering past practices, settlements

and the like in analogous disputes was proper and sustainable at least as to the procedure adopted, if not the conclusions reached. Apparently the bargaining agreement in suit is yet another example of situations which, as said in *Warrior,* "the draftsmen cannot wholly anticipate." (363 U.S. 574, 578.) ▮ Continuing: "The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." (363 U.S. 574, 578-579.) ▮ And at pages 580-581: "Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators." ▮ Finally, "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law— the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment . . . The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." (363 U.S. 574, 581-582.)

In the present proceeding, the claims before the arbitrators were supported by an affidavit of the Acting General Chairman of the Brotherhood which discussed the interrelationship between section 2 of article 13 and the work-assignment rules. Also mentioned in the affidavit were various awards and settlements in the industry which, in the opinion of the arbitrators, warranted the allowance of each claim. Santa Fe complains that these awards and settlements involved isolated situations which should not be considered as practices reflecting the industry's common law;[4] but this complaint goes more to the weight of the matters relied on by the board of arbitration. ▮ The decisions in the *Steelworkers Cases* enjoined the trial judge to respect the competence of the arbitrators whose

---

[4]Interestingly enough, an extra day's pay was awarded the claimants in the cases cited to the board by the Brotherhood, even though the pertinent provisions of the bargaining agreement were wholly silent with respect to such compensation.

awards he was asked to vacate; as a reviewing court we are similarly enjoined. ▮▮▮▮ Basically, in our opinion, appellant's present assignment of error goes to the merits of the award. Our duty is clear in the light of what was said in the *Enterprise* case: "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." (363 U.S. 593, 596.) Contrary to appellant's contention, four cases decided by federal appellate courts after the *Steelworkers* trilogy are not in conflict with the principle above mentioned that courts may not inquire into the merits of the arbitrator's decision. These cases[5] simply hold that where an arbitrator goes beyond the issue submitted for his decision, he has exceeded his authority. As will be subsequently shown in our discussion of appellant's next assignment of error, such is not the situation at bar.

The award of the arbitrators, according to appellant, exceeded their jurisdiction by effecting a "change" in the air hose rule. Section 1286.2, Code of Civil Procedure, provides that the court shall vacate the award if it determines that "(d) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. . . ." Decisional law, particularly the *Steelworkers* trilogy, is to the same effect. Appellant quotes the following from *Enterprise*: ". . . [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (363 U.S. 593, 597.)

In the instant case, it is argued, the parties authorized the board of arbitration only to interpret the collective agreement; specifically denied by Clause F was its authority to

---

[5] *Textile Workers Union etc. A.F.L.-C.I.O.* v. *American Thread Co.*, 291 F.2d 894; *Local 791, International Union etc. A.F.L.-C.I.O.* v. *Magnavox Co.*, 286 F.2d 465; *United Steelworkers etc. A.F.L.-C.I.O.* v. *Northwest Steel Rolling Mills, Inc.*, 324 F.2d 479; *Kansas City Luggage & Novelty Workers Union* v. *Neevel Luggage Mfg. Co.* (8th Cir. 1964) 325 F.2d 992.

"change existing agreements governing rates of pay, rules and working conditions." It seems to us that this is the same argument which was rejected in *O'Malley* v. *Wilshire Oil Co.*, 59 Cal.2d 482 [30 Cal.Rptr. 452, 381 P.2d 188], where the court quoted *in extenso* from the *Warrior* case. (363 U.S. 574.) ▮▮ In *Warrior* it was declared (the language employed being emphasized in *O'Malley*): "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." (363 U.S. 574, 584-585.) ▮▮ Continuing, "Since any attempt by the court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." (363 U.S. 574, 585.) The court in *O'Malley,* after quoting the above, declared: "The instant clause[6] is not only 'vague,' but hardly seems to reach the status of an 'exclusion' clause. To state that the arbitrator lacks power to amend, modify or otherwise change an agreement is merely to restate explicitly the inherent limitation in the arbitrator's power to handle grievances relating to the '*application and interpretation of this Agreement.*' If the provision empowers the arbitrator only to apply and interpret the agreement, he is not authorized to amend it. In any event, whatever the company contends as to vagueness, to construe the exclusion clause as the company desires would countenance a full-scale leap into the merits of the dispute in order to construe the limitations of arbitrability. . . ." (59 Cal.2d 482, 493.)

Other, and more recent, decisions in accord with the above approach could be cited. In our opinion, the subject matter of the dispute contemplated an interpretation of the provisions subsequently construed by the arbitrators. There was no exclusionary clause, clearly spelled out, which prohibited the resolution of the problem. There is no merit to the instant assignment of error.

---

[6]The O'Malley clause provided: "Under no circumstances may an arbitration decision in any manner nullify, amend, modify, extend, reduce or otherwise change any of the terms or conditions of this Agreement."

Finally, appellant complains that the board of arbitration failed to consider the impact of the Cheney Award on the particulars of each of the instant claims. It appears, however, that Referee Cheney did not have occasion to consider the ''work assignment rule'' which, as mentioned above, contributed to the conclusions reached by the arbitrators. While it is true that article 13 of the bargaining agreement recites that the ''95-cent rate specified herein is subject to the conditions set forth in the Award of Referee Cheney,'' the latter is not made a part of the contract *in toto*. To the contrary, it is given recognition only to the extent that it is not inconsistent with the agreement of the parties pursuant to article 38.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 10, 1964.