[Civ. No. 11513. Third Dist. Jan. 17, 1968.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Respondent, v. D. R. WARD et al., Defendants and Appellants.

Leep, Saunders & Halpin and Jack Halpin for Defendants and Appellants.

Harry S. Fenton, Holloway Jones, Jack M. Howard, John P. Horgan, John F. Donovan and Richard S. Levenberg for Plaintiff and Respondent.

FRIEDMAN, J.—Defendants Ward are landowners who appeal from a judgment fixing damages in an eminent domain action. The suit was brought by the State Department of Public Works to acquire a triangular-shaped parcel of about six acres, leaving the Wards with 46.5 acres; to extinguish a permanent easement of access between the Wards' remaining land and the neighboring freeway (Interstate 5), which had been created by a 1951 agreement between the state and the Wards' predecessors; providing the Wards, however, a right of access to a nearby county road in lieu of that easement. One of the issues in the lawsuit was the physical configuration of the permanent easement being extinguished. The Wards asserted an easement permitting relatively direct travel between their land and the freeway. The state sought to establish a more circuitous route. The trial judge agreed with the state and, in the valuation trial, instructed the jury accordingly. Configuration of the easement is the sole issue on appeal. The issue turns on interpretation of a 1951 deed and an accompanying contract between the former landowners and the state.

Interstate 5 (former U.S. 99) extends north and south in Shasta County just north of Redding. The Wards' land lies to its east. Shasta Dam Boulevard extends westerly from the opposite side of Interstate 5 and originally formed a T-shaped intersection with the latter. In 1951 the state bought approximately 25 acres east of U.S. 99 from the Wards' predecessors for the purpose of freeway construction and ultimately to provide a site for a future traffic interchange with Shasta Dam Boulevard. The state and the landowners desired to provide the latter with some form of access between their remaining property and the freeway. Initially Shasta Dam Boulevard traffic would leave and enter U.S. 99 at grade; ultimately, however, a grade separation or overpass would be built to accommodate traffic entering and leaving Shasta Dam Boulevard. The 1951 grant deed to the state and the accompanying contract contained provisions designed to provide the landowners with temporary access to the freeway before construction of the grade separation structure and with permanent access at another location after the grade separation had been constructed.[1] These documents were prepared by the Division of Highways.

---

[1] The 1951 deed provided:

"This conveyance is made for the purpose of a freeway and the grantor hereby releases and relinquishes to the grantee any and all abutters rights appurtenant to grantor's remaining property, in and to said freeway.

"Excepting and Reserving, however, unto grantor, his successors or assigns, the right of access to the freeway over and across the southerly twenty feet of the course in the easterly line of the parcel of land described above as N. 10°27'24" W., 509.41 feet.

" . . . . . . . .

"The grantor further understands that the present intention of the grantee is to construct and maintain a public highway on the lands hereby conveyed in fee and the grantor, for himself, his successors and assigns, hereby waives any claims for any and all damages to grantor's remaining property contiguous to the property hereby conveyed by reason of the location, construction, landscaping or maintenance of said highway " (Dft. Ex. B.)

The accompanying contract declared:

"3. Until such time as a vehicular grade separation structure is constructed at or about Engineer's Station 368+00, a temporary 20-foot opening into the freeway will be allowed right of approximate Station 370+10 at the point where the existing property access road intersects the easterly freeway right of way line. The State, at the time of construction of the freeway, shall construct within the freeway right of way area, an access road from said temporary opening running northwesterly along and just inside of the easterly right of way line to a point of connection with the easterly (northbound) lane of the freeway right of approximate Engineer's Station 378+00. When said grade separation is constructed, said temporary opening shall be closed, and access into the freeway from the easterly remainder of grantors' property shall be had via the 20-foot opening right of approximate Station 368+50, as provided in said Grant Deed."

The present lawsuit was brought in 1965 primarily to acquire additional property for the overpass foreseen in 1951. As designed by the state's engineers after 1951, the overpass would originate in two roads (one for entry and one for exit) taking off from the easterly lane of Interstate 5 at a northeasterly angle. These would converge into a two-lane, two-way ramp curving upward and westerly into an overpass extending across the freeway to Shasta Dam Boulevard. The landowner's "permanent" access point, as fixed by the 1951 transaction, lies opposite the westerly-curving arc of the ramp. The following diagram, not drawn to scale, shows the

general configuration of the overpass structure designed by the state, the location of the Wards' remaining property, the 20-foot opening of the permanent easement described by the 1951 documents, and the substitute access route offered by the state in the present action:

The trial court ruled and later entered a finding that the easement being condemned consisted of a right to access to the new grade separation structure, if and when constructed, but not a right of direct access to the easterly lane of the freeway. Schematic representations of the ramp and overpass designed by the Division of Highways were admitted in evidence. They correspond generally with the sketch given above. A three-dimensional representation would disclose that at a point opposite the easement opening into the Ward property, the height of the ramp is perhaps 20 to 25 feet. The court gave jury instructions corresponding to its ruling.[2]

This is not a case involving an abutting property owner's right of direct access to the adjacent highway. (Cf. *People* v. *Ayon*, 54 Cal.2d 217, 224 [5 Cal.Rptr. 151, 352 P.2d 519].) The landowners sold their abutters' rights to the state in 1951. At stake here is a specially created permanent easement reserved from the 1951 grant. The deed described the permanent easement as a right of ''access to the freeway,'' the accompanying contract as ''access into the freeway.'' ■ A contract is said to be ambiguous when on its face it is subject to two different reasonable interpretations. (*Atchison etc. Ry. Co.* v. *Brotherhood R.R. Trainmen*, 229 Cal.App.2d 607, 614 [40 Cal.Rptr. 489].) ■ The 1951 documents fixed the opening of the permanent easement at the owner's property line but neither its route nor its terminus. Important elements were left to future agreement or dispute. Thus the 1951 documents were inherently ambiguous.

---

[2]An instruction on severance damages declared as follows:

''In connection with access to Interstate 5, you are instructed that the property owners had a contractual and deeded right granted by the State of California to access to any grade separation which might be built in the future at the intersection of Hwy 99 and Shasta Dam Boulevard. This right included the right to reasonable means of ingress and egress to the property. No particular type of road connection was required, but any connection which was to be permitted had to be reasonable, taking into account the type of grade separation to be built by the State of California. In this action the State of California is taking the right of access of the property owner to the grade separation. If you find that this taking has damaged the remaining property of the property owners you must award the property owners just compensation for the taking.''

■ Although it heard the testimony of a state engineer who participated in the 1951 negotiations, the record demonstrates that the trial court reached its interpretation of the instruments without the aid of extrinsic evidence. Thus the appellate court is not bound by its interpretation. (*Parsons* v. *Bristol Dev. Co.*, 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) The trial court's interpretation was abstractly correct but caused error at the trial. The court properly held that the permanent access reserved by the 1951 declarations had its terminus in a traffic interchange structure rather than the freeway itself. The vice of the ruling was that (as presented for valuation purposes at the trial) it was tied to the design of the specific interchange structure prepared by the state after the conclusion of the 1951 arrangements and which supplied access vastly more constricted than that reasonably within the parties' contemplation in 1951.

According to the evidence, no particular interchange design existed at the time of the 1951 agreement. Some years later designers evolved and the Division of Highways approved the trumpet-shaped ramp and overpass structure presented at the trial. Highway users are familiar with varied interchange designs, some of which permit entry and exit at grade and in all four directions. The familiar "diamond" interchange is an example. The "trumpet" design prepared for this particular highway junction offered more limited travel. An access road from the Ward property to the westerly-curving arc of the overpass would present the traveler with these alternatives: Coming from the south in the northbound freeway lane, he would enter the right-hand lane of the off-ramp and drive to the opening of the access road, turn right and enter the Ward property. He could not leave the Ward property by that ramp, because no left turn would be permitted at the junction of the access road and the ramp.[3] He could leave the Ward property only by means of the overpass extending westerly to Shasta Dam Boulevard. If he wished to enter the freeway, he would be required to cross it via the overpass, make a U-turn somewhere on Shasta Dam Boulevard and return to the freeway, turning southward at its west side or returning to its east side via the overpass and then entering the northbound freeway lane from the ramp. Since, at its arc opposite the permanent easement opening, the state-built

___

[3]At oral argument counsel for both parties agreed that such a prohibition would be in effect.

ramp would be 20 or 25 feet high, a direct access road between the easement opening and the structure would necessitate a privately built ramp. At oral argument counsel agreed that evidence in the record of the valuation trial placed the landowners' estimated cost of such a ramp at $53,000. When tied to the particular interchange design proposed by the state and in evidence before the jury, the easement consisted primarily of the landowners' right to build a ramp at their own expense to an off-ramp *from* the freeway, with only the most indirect and circuitous means of travel *into* the freeway.

 The 1951 documents are to be interpreted to give effect to the apparent intention of the parties. (*People* ex rel. *Dept. of Public Works* v. *Scheinman,* 248 Cal.App.2d 180, 184 [56 Cal.Rptr. 168].) An ambiguity is to be construed more strongly against the party who prepared the document, in this case the state. (Civ. Code, § 1654.) Also, a reservation in a grant is to be interpreted in favor of the grantor, in this case the landowners (Civ. Code, § 1069). Before entering into the 1951 transaction, the Wards' predecessors had an abutting property owner's right of access to the highway. Like any other abutting owner, they could be deprived of direct access to the opposite side of the highway without compensation. (*People* v. *Ayon, supra,* 54 Cal.2d at p. 224.) Thus their compensable interest consisted of ability to enter and leave their property via the easterly lane. They sold this compensable interest to the state, reserving a specially created easement of access ''to'' or ''into'' the freeway. A freeway, to be sure, is a limited access highway.[4] Nevertheless, the 1951 documents had no language signifying that access was limited to vehicles leaving the freeway or that access was any more limited for those entering the freeway than those leaving it. Nor did the documents give any hint of a change in grade at the point of access to the state's property which would impose on the landowner the cost of an elevated structure. In the absence of restrictive terms a fair appraisal of the parties' intent is that the landowner would have means of entering and leaving the freeway's easterly

---

[4]Streets and Highways Code section 23.5 provides: '' 'Freeway' means a highway in respect to which the owners of abutting lands have no right or easement of access to or from their abutting lands or in respect to which such owners have only limited or restricted right or easement of access.''

lane by a reasonably direct route and without the expense of solving or surmounting a change in grade.

For the period preceding construction of a grade separation structure, the 1951 documents fixed the access route with some precision, for it specified the location of both ends of a temporary access road between the land and the freeway. Upon the construction of a grade separation structure, the easement opening would shift to its permanent location at a point (according to maps in evidence) approximately opposite Shasta Dam Boulevard. This shift in location evidenced a mutually held intention that permanent access would lie between the land and the grade separation structure, not between the land and the freeway itself. The shift in location, however, did not reasonably imply the restrictive, circuitous and expensive access supplied by the overpass design ultimately evolved by the state.

The state, to be sure, did not undertake to design an interchange in any particular way. Certainly the parties had in mind a structure adapted to a T-shaped junction rather than a four-way crossing. The state did bind itself, if only by implication, to a design conforming to the landowners' reasonable expectations of leaving and entering the easterly freeway lane by a reasonably direct route and without the expense of surmounting a change in grade. The state argues that ''there is no language'' in the documents from which to infer any particular degree of directness or an intended access at-grade. The argument does simultaneous violence to the rule of construction against the draftsman and the rule favoring the grantor. Without limiting language, the phrases denoting access ''to'' or ''into'' the freeway are too broad to signify the restricted access proposed by the state's design and conveyed to the jury through that design.

Judgment reversed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied February 14, 1968.