[L.A. No. 31247. Jan. 22, 1981.]

LOYD S. DRENNAN, Plaintiff and Appellant, v.
SECURITY PACIFIC NATIONAL BANK,
Defendant and Respondent.

COUNSEL

Young, Wooldridge, Paulden & Self, Young, Wooldridge, Paulden, Self, Farr & Hugie and David Griffin for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, George R. Richter, Jr., William M. Burke, Jeffrey S. Turner, Pierce T. Selwood and Roy G. Wuchitech for Defendant and Respondent.

Almon B. McCallum, Loring E. Tocchini, Severson, Werson, Berke & Melchior, James B. Werson, Allan L. Fink and Jan T. Chilton as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**MOSK, J.**—Plaintiff, Loyd S. Drennan, purchased a mobilehome financed by defendant Security Pacific National Bank (defendant) under a conditional sale contract. The contract provided that if plaintiff repaid the indebtedness prior to maturity, he was entitled to a refund of the unearned portion of the finance charge in accordance with the "Rule of 78's." Plaintiff claims that the contract was an adhesion contract, that the term "Rule of 78's" is ambiguous, and that the prepayment provision is void.

 The primary question before us is whether federal law precludes us from requiring that conditional sale contracts provide a definition of that term. As will appear, we answer this question in the affirmative and conclude, in addition, that while a statement in or appended to the contract to alert the borrower that the rule may operate to his disadvantage may be desirable and consistent with federal law, the law governing adhesion contracts does not compel such a warning.

Plaintiff purchased a mobilehome on June 5, 1964, at which time he entered into a conditional sale contract with the seller. He financed $21,965 of the purchase price; the finance charge, $27,997.60, was computed at the time the contract was signed, so that the total amount he would be required to pay by the end of the term of the contract was $49,962.60. The contract called for him to pay that sum in 180 monthly installments of $244 each, including interest on the unpaid balance at the rate of 12.98 percent a year. A clause of the agreement provided that if plaintiff prepaid the indebtedness in full prior to maturity, he would be entitled to a refund of the unearned portion of the finance charges "computed in accordance with the 'Rule of 78's . . . .'" The contract was assigned by the seller to defendant.

After making the installment payments called for in the contract for almost three years, plaintiff proposed to sell the mobilehome. Defendant notified him that the amount required to pay off the loan was $22,306.79, or $341.79 more than he had originally borrowed, although he had paid more than $9,700 in installment payments in the interim.

Plaintiff filed a complaint for declaratory relief on behalf of himself and others similarly situated, alleging that the contract was an adhesion contract and that the provision regarding prepayment quoted above is

vague, ambiguous, and uncertain because it failed to explain or define the term "Rule of 78's" and did not advise him that a "prepayment penalty" would be charged, and the amount thereof. He sought a declaration that the provision was void and unenforceable, and prayed for damages in the amount of the "prepayment penalty" on behalf of the members of the class. The trial court sustained defendant's demurrer without leave to amend, and dismissed the action. Plaintiff appeals from the ensuing judgment.

The operation of the "Rule of 78's" has been explained in a variety of ways; two of these explanations are set forth in the margin.[1] For the purposes of this opinion, it is sufficient to observe that under this method of calculating the rebate to a borrower upon repayment of a loan prior to maturity[2] he receives a smaller refund than he would be entitled to if the interest was calculated strictly on the basis of the time he had use of the money. For example, if the prepayment occurs one-third of the way through the term of the loan, the lender retains not one-third of the interest but over 46 percent. If the refund due the borrower is de-

[1]The Civil Code describes the rebate due under the rule by specifying that the "amount of the unearned portion of the finance charge shall be at least as great a proportion of the finance charge ... as the sum of the periodic monthly time balances payable more than 15 days after the date of prepayment bears to the sum of all the periodic monthly time balances under the schedule of installments in the contract ...." (Civ. Code, § 2982, subd. (e)(1).)

The Commerce Clearing House Consumer Credit Guide employs the following explanation of the operation of the rule:

"In the case of advance payments, many creditors will rebate an unearned finance charge in accordance with the Rule of 78's, also referred to as the sum-of-the-digits method, which works in the following manner:

"On a 12-month repayment plan, the numbers 1 through 12 are added together to provide the figure 78. This becomes a denominator in the calculation. The sum of the months expired at the time of prepayment becomes the numerator. The resulting fraction represents the earned finance charge.

"The first month of a 12-month obligation is considered as 12 because the outstanding balance is 12 times as large during the first month as it is for the last month. The second month is 11, and so on until 1 designates the final month.

"Thus, the portion of the finance charge considered earned after the first month is 12/78 of the entire finance charge. For the second month alone it is 11/78. If prepayment occurs at the end of the second month, the earned finance charge is 23/78 of the total finance charge—12/78 plus 11/78.

"If prepayment occurs after the 8th month, the amount of earned finance charge will be 68/78 (the sum of 12/78, 11/78...5/78). Put another way, the rebate will amount to 10/78 of the total finance charge, less any charges that might be deducted from that amount." (CCH Consumer Credit Guide, Truth-in-Lending, ¶ 1452.)

[2]While we recognize that a conditional sale contract is not a loan and that the finance charge assessed does not constitute interest (*Boerner* v. *Colwell Co.* (1978) 21 Cal.3d 37, 45-47 [143 Cal.Rptr. 380, 577 P.2d 200]), for literary convenience this opinion will not make these distinctions.

termined by the actuarial method, which measures the true interest yield, the amount of interest charged would bear a direct relationship to the amount of money used by the borrower and the period during which he had retained it, and the refund would be larger than under the "Rule of 78's." Although the difference between the two methods is insignificant on a short-term loan of a relatively small amount,[3] for larger loans of longer duration, the actuarial method results in a substantially larger refund to the consumer.

Plaintiff does not claim that defendant acted illegally by calculating the refund due him under the "Rule of 78's." Indeed, the Rees-Levering Motor Vehicle Sales and Finance Act (Civ. Code, § 2981 et seq.),[4] which governs the terms of conditional sale contracts for automobiles and mobilehomes, states that the refund on prepayment may be determined according to the rule (Civ. Code, § 2982, subd. (e)(1)).[5] What plaintiff does contend is that the contract he signed was an adhesion contract and that the term "Rule of 78's" is ambiguous; thus the provision that the amount of rebate on prepayment is to be calculated in accordance with the rule is void.

There can be no doubt that the contract at bar is an adhesion contract, and defendant so concedes.[6] In a contract of adhesion, ambiguous terms will be interpreted against the stronger party and in a manner which would support the reasonable expectations of the weaker party. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 270-271 [54 Cal.Rptr. 104, 419 P.2d 168].)

---

[3]For a 12-month loan of $1,200, subject to a finance charge of $96, the maximum difference between the rebate required by application of the "Rule of 78's" and the actuarial method is 71 cents, if the loan is repaid after four months.

[4]Hereinafter called the Rees-Levering Act.

[5]The utilization of the "Rule of 78's" to calculate the rebate under the Rees-Levering Act is authorized where, as here, the finance charge is determined at the outset of the transaction. Although the act has been amended in numerous respects since plaintiff entered into the contract, this opinion will refer to the current version of the statute, unless the amendments have resulted in changes which are relevant to the issues before us.

[6]In *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284], we defined such a contract as a "standardized contract prepared entirely by one party to the transaction for the acceptance of the other; such a contract, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis, without opportunity for bargaining and under such conditions that the 'adherer' cannot obtain the desired product or service save by acquiescing in the form agreement."

Defendant urges that the term "Rule of 78's" is not ambiguous because it has a settled meaning. It is true that, unlike other contractual provisions which have been held to be ambiguous (e.g., *Estate of White* (1970) 9 Cal.App.3d 194, 200 [87 Cal.Rptr. 881]; *Atchison T. & S. F. Ry. Co. v. Brotherhood R.R. Trainmen* (1964) 229 Cal.App.2d 607, 615 [40 Cal.Rptr. 489]), the phrase in issue unquestionably has an established meaning. It is equally true, however, that, as is well known to the members of the financial community, including defendant, the average consumer lacks the vaguest notion of what those words mean and that, therefore, the term conveys no information to him regarding the means by which a rebate will be calculated. Whether or not the use of a term which the drafter of the contract knows to be unintelligible to the weaker party invokes the law relating to adhesion contracts we need not reach because we conclude this court is prohibited by federal law from requiring that a lender explain the meaning of the words in question.

■ We turn, then, to a summary of the laws requiring disclosure of credit terms to consumers. The purpose of such enactments is to assure that a consumer will be in a position to "compare more readily the various credit terms available to him and avoid the uninformed use of credit." (See 15 U.S.C.A. § 1601 et seq.) These provisions are embodied by the federal government in the Truth in Lending Act (hereinafter TILA). TILA provides that state disclosure laws inconsistent with the act are not binding on a creditor. (15 U.S.C.A. § 1610 (a).) In California, the disclosure laws appear in the Rees-Levering Act, and in the Unruh Act (Civ. Code, § 1801 et seq.), which regulates retail installment sales.

The TILA empowers the Federal Reserve Board (Board) to enact regulations to carry out its purposes (15 U.S.C.A. § 1604), and the Board has promulgated detailed rules in Regulation Z (12 C.F.R. pt. 226) pursuant to this authorization. The Rees-Levering Act provides that any information required to be disclosed in a conditional sale contract subject thereto may be set forth in the terminology "required or permitted under Regulation Z." (Civ. Code, § 2982, subd. (g).)

Under Regulation Z, a creditor must identify the method of computing any unearned portion of the finance charge in the event of prepayment of an obligation. (12 C.F.R. § 226.8 (b)(7).)[7] In an inter-

---

[7]The Rees-Levering Act was amended in 1979 to provide that as of January 1, 1981, a contract subject to its terms must identify the method of calculating a rebate on prepayment, and that a reference to the "Rule of 78's" constitutes sufficient identification. (Civ. Code, § 2982, subd. (a)16(A).)

pretation of this provision, the Board has determined that if a rebate is made according to the "Rule of 78's" a reference to the rule without explanation of its meaning or operation is sufficient, giving as its reason that an explanation of the rule involves "complex mathematical descriptions which generally cannot be condensed into simple accurate statements, and which if repeated at length on disclosure forms could detract from other important disclosures." (12 C.F.R. § 226.818 (c).)

A federal court has upheld the validity of these regulations. In *Bone v. Hibernia Bank* (9th Cir. 1974) 493 F.2d 135, a borrower claimed that a lender violated the TILA by failing to explain the operation of the "Rule of 78's." The court acknowledged that the meaning of the rule "is known to virtually no credit consumers" (493 F.2d at p. 138) but held that the Board was empowered to decide that a lender should not be required to explain the operation of the rule, and that the Board's reasons for this determination were persuasive.

In reaching its conclusion, the court relied in part upon a statement by the vice chairman of the Board of Governors of the Federal Reserve Board that the Board was unable to find a simple way to explain the rule and that the alternative "would seem to require a lengthy and complicated mathematical statement which ... would be ...uninformative to the consumer, and would have the added disadvantage of further complicating the disclosure statement and detracting from other important disclosures." The court went on to say' "[I]t is precisely these kinds of policy decisions about the disclosure statement, requiring the weighing and balancing of the various available choices, that Congress entrusted to the Federal Reserve Board by granting it such broad powers. The conclusions thus reached by the Board are based upon its specialized experience and access to information, which is not likely to come to the attention of a particular judge in a given case." (493 F.2d at p. 140.) The principles stated in *Bone* have been followed in other federal cases. (See, e.g., *Gantt v. Com. Loan Co.* (8th Cir. 1978) 573 F.2d 520, 524-526; but see *Scott v. Liberty Finance Co.* (D.Neb. 1974) 380 F.Supp. 475, 479.)

Plaintiff does not challenge the Board's authority to determine that an explanation of the rule is not required, nor does he explicitly challenge the Board's reasons for this determination. Rather, he claims that the federal regulations set forth only a minimum standard, and that a state is free to require a definition of the rule under its laws relating to adhesion contracts. He recognizes that state laws inconsistent with the

TILA are not binding on creditors (15 U.S.C.A. § 1610 (a)), but relies upon a provision of Regulation Z to the effect that a creditor may supply explanations in addition to those mandated by the regulation if the additional information does not "confuse the customer ... or obscure, or detract attention from the information" which must be provided under Regulation Z. (12 C.F.R. § 226.6 (c).)

Plaintiff all but concedes that a detailed mathematical explanation of the operation of the rule would confuse the consumer or obscure other disclosures required by the TILA. He claims, however, that a chart setting forth the amount of rebate due at various times of prepayment or an example of how the rule operates in a typical contract would convey the essential information without doing violence to the intent and purpose of the TILA.

Even if we were to agree that such an explanation would be helpful, we are not free to hold that it is required. The Board's rulings go further than the mere absence of a requirement that the creditor define the rule. The fact that the board has exercised the authority given to it by Congress to determine that an explanation would be too complicated to be informative and would detract from other important disclosures mandated by Regulation Z constitutes a prohibition of a state-imposed requirement that the rule be defined by way of example or otherwise.

A recent case decided by the United States Supreme Court supports our conclusion. *Ford Motor Credit Co.* v. *Milhollin* (1980) 444 U.S. 555 [63 L.Ed.2d 22, 100 S.Ct. 745], involved the validity of the Board's interpretation of the TILA as not requiring a statement in the loan contract that the creditor has the right to accelerate payment of the entire debt upon the buyer's default. As in *Bone* v. *Hibernia Bank, supra*, 493 F.2d 135, the high court upheld the Board's discretion in making the ruling, using language which reiterates the broad sweep of the Board's powers in interpreting the TILA.[8] Of particular significance for the

---

[8]The court stated: "It is a commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation. Because legislators cannot foresee all eventualities, judges must decide unanticipated cases by extrapolating from related statutes or administrative provisions. But legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.

"At the very least, that caution requires attentiveness to the views of the administra-

problem before us is the following language: "The concept of 'meaningful disclosure' that animates TILA ... cannot be applied in the abstract. *Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure ... and the need to avoid ... [informational overload].' ... And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process." (444 U.S. at pp. 568-569 [63 L.Ed.2d at p. 33].)

The Board's determination that if the meaning of the term "Rule of 78's" were defined in conditional sale contracts the result would confuse consumers and detract from other important disclosures is an attempt by the Board to strike the balance between "competing considerations of complete disclosure ... and the need to avoid ... ['informational overload]'"[9] and state law which would require explanation of the rule would disturb that balance.[10]

---

tive entity appointed to apply and enforce a statute. And deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.

" ... [T]raditional acquiescense in administrative expertise is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in 'setting [the statutory] machinery in motion. . . .' [Citation omitted.] ... Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it substance in promulgating regulations thereunder. . . . Moreover, language in the legislative history evinces a decided preference for resolving interpretive issues by uniform administrative decision, rather than piecemeal through litigation. . . . Courts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law, ... judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational.

"Finally, wholly apart from jurisprudential considerations or congressional intent, deference to the Federal Reserve is compelled by necessity; a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views." (444 U.S. at pp. 565-568 [63 L.Ed.2d at pp. 31-33].)

[9]Congress appears to be heading in the direction of fewer, more simplified disclosures. After a nationwide consumer credit survey revealed that disclosure statements were too complicated, Congress recently amended the TILA to provide that as of 1982, a lender need only indicate whether or not the consumer is entitled to a rebate of any finance charge upon prepayment. (Pub.L.No. 96-221, §§ 614, subd. (a), 625, subd. (a); 94 Stat. 132 (Mar. 31, 1980).)

[10]A recent report of the Senate Banking, Housing and Urban Affairs Committee recommends that state legislatures prohibit the utilization of the "Rule of 78's" for long term transactions. The committee also recommends the establishment of a National Consumer Usury Commission to consider whether Congress should prohibit use of the rule. (Sen. Rep. No. 96-923, 2d Sess., p. 11 (1980).)

Our conclusion is further buttressed by an unofficial letter interpretation of Regulation Z by the Board, issued at defendant's request after the commencement of this litigation. The letter states that in light of the Board's conclusion that the operation of the "Rule of 78's" cannot be explained in a simple manner and that an attempt at an explanation would detract from other important disclosures required by the regulation, "it is the staff's opinion that a state law (whether statutory or judicially imposed) requiring disclosure of the meaning and implication of the Rule of 78's formula would be inconsistent with Regulation Z . . . ."

Plaintiff argues that Regulation Z permits disclosures pursuant to state requirements in addition to and inconsistent with those set forth in the regulation, provided that the form of such disclosures comports with the provisions of section 226.6, subdivision (c) of Regulation Z. Subdivision (c) states that a creditor may, at his option, provide additional information or explanations to a consumer if the additional matter does not mislead the customer or obscure or detract from the disclosures required by Regulation Z, and provided also that these additional disclosures are made on a separate paper or are clearly identified as state disclosures and appear below the disclosures required by the regulation.

Plaintiff's assertion is without merit for two reasons. First, both the regulation and the unofficial board interpretation referred to make it clear that a creditor may *elect* to make explanations provided for by state law which are inconsistent with Regulation Z, but may not be required to do so.[11] Second, the Board has determined that explanation of the rule would mislead the customer and detract from other important information which Regulation Z requires to be disclosed in the contract; therefore, an explanation of the rule is prohibited by the terms of subdivision (c) even if the creditor complies with the format specified therein.[12]

---

[11]The letter from the Board states, "It is the staff's opinion that the making of inconsistent state disclosures in accordance with § 226.6(c) is done at the creditor's option; a creditor could elect not to make the state-required disclosures."

[12]*Mason* v. *General Finance Corp. of Virginia* (4th Cir. 1976) 542 F.2d 1226, relied upon by plaintiff, is distinguishable. It was there held that a state disclosure law which required the use of terminology different than specified by TILA was inconsistent with the federal enactment, but that the state-imposed terminology could appear in the contract provided that it was not intermingled with the information required by Regulation Z and complied with the requirements of form set forth in subdivision (c) of section 226.6. Unlike the present case, *Mason* did not involve the question whether an inconsis-

 Plaintiff next asserts that a requirement imposed by the state that a conditional sale contract warn the consumer of the consequences of the application of the rule would not violate federal law and would alert consumers to the disadvantages inherent in the operation of the rule.

It is probably true that a statement in the nature of a warning to the consumer is not contrary to federal law. (See 12 C.F.R. § 226.604 (b).)[13] However, we cannot conclude that a court may impose a requirement for such a warning under the law of adhesion contracts. The warning would not resolve any ambiguity in the meaning of the term "Rule of 78's" and thus would not cure the only contract defect upon which plaintiff relies.[14]

We conclude, therefore, that the trial court did not err in sustaining the demurrer. Nevertheless, since both parties have discussed at great length whether the rule is fair to consumers and whether its use is justified because of the manifest benefits to the creditor, we discuss their assertions in this regard.

Although a simple explanation of the operation of the "Rule of 78's," if one could be devised, or a warning of its disadvantages, could be of some assistance to consumers,[15] the more fundamental question is whether utilization of the rule should be permitted at all.

tent state disclosure requirement was mandatory upon the creditor since the issue there was not the creditor's failure to disclose but an improper form of disclosure. Second, *Mason* did not deal with the creditor's failure to explain a term in the contract which the consumer did not comprehend and a determination by the Board that an explanation would confuse the consumer.

[13]The section provides: "Whether State laws are inconsistent with Regulation Z necessarily depends on the nature of the State laws. Section 226.6(b)(1) provides that State law is inconsistent to the extent that it 'requires a creditor to make disclosures different from the requirements of this part with respect to form, content, terminology, or time of delivery.' This refers to disclosures of the kinds of information covered by Regulation Z, and not to other or collateral information such as a statement telling the customer that he should read the contract carefully, or that there should be no blanks in the contract. . . ."

[14]An additional principle of the law of adhesion contracts is that even a term clearly stated may be unenforceable if it is so unconscionable that its enforcement would be contrary to public policy. (See, e.g., *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 99-101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].) But, although plaintiff asserts that the rule is unfair to consumers, an argument which we shall discuss in detail, *infra*, he does not seek its invalidation for that reason; his complaint focuses upon the absence of an explanation of the operation of the rule.

[15]There is some question whether even a simplified explanation would be meaningful to a consumer without a reference to the actuarial method of computation and an explanation of its advantages over the "Rule of 78's" so that the consumer would have

In considering fairness to the consumer, we begin with the observation that the rule applies not only to a borrower who repays a loan in full prior to maturity and liquidates the debt, but also to prepayment because of refinancing or consolidation of debts. In the latter event, the rule is applied to the renewed debt as part of the amount financed. A very substantial number of loans are refinanced or consolidated, perhaps as high as 70 percent or 80 percent in some types of loans.[16] According to defendant, 43 states authorize calculation of a prepayment rebate by the "Rule of 78's" but most of them limit the term or size of the loan to which the rule may be applied.[17] One popular writer on financial affairs declares that the Federal Trade Commission estimates the exaction of the finance charge under the rule costs the consumer $112 million a year in "overcharges" although some estimates place the figure more conservatively at between $50 million and $100 million a year. (Porter, *Your Money, Learning About the "Rule of 78's"* S. F. Chronicle (Apr. 18, 1980) p. 34, col. 1.) Thus, it is clear that the rule is applied to a vast number of consumer transactions and that the cost to the consumer from its utilization is enormous.

Defendant, in support of its argument that the calculation of a rebate by the "Rule of 78's" does not yield significantly different results from the actuarial method, employs a small loan ($1,200) of short duration (one year) to demonstrate that the difference between the two methods amounts to only 71 cents if the loan is repaid in the fourth month. (See fn. 3, *ante* at p. 769.) However, if the amount of the loan or its term is increased, use of the rule can result in a much smaller refund than if the actuarial method were applied. *Hunt,* in a revealing exposition of the manner in which the rule operates, offers the following examples: a $15,000 mobilehome financed over a period of 12 years at the rate of $9 per $100 in interest, and repaid at the end of the 52d month, requires the lender to rebate $1,157 more if the amount of the rebate is calculated by the actuarial method than by the "Rule of 78's." Using the same loan terms, a borrower who prepays the loan in the first three months of its term will pay over 17 percent interest expressed as the an-

some means of comparison. There is considerable doubt whether the complexity of such an explanation would not outweigh its benefits, even if a state were free to require an explanation.

[16]Hunt, *Hidden Penalty in the Rule of 78* (1975) 55 B.U. L.Rev. 331, 333 (hereafter *Hunt*).

[17]As we shall see, recent amendments to the Rees-Levering Act and the Unruh Act have limited the term of a loan to which the rule may be applied.

nual percentage rate [the only figure in the contract which discloses to the borrower how much credit costs him (*Mason* v. *General Finance Corp., supra*, 542 F.2d 1226, 1233)] which is more than 3 percent over the rate actually disclosed in the contract. Even for a loan of a shorter term (48 months) and a far lesser amount ($5,000), the buyer receives $54 less as a rebate under the rule than if the actuarial method were utilized. (*Hunt, op cit. supra*, at pp. 347, 361.)

Other commentators have remarked upon the unfair effect of the rule on consumers. (See, e.g., Comment, *Consumer Protection: Truth-in-Lending Disclosure of the Rule of 78ths* (1973) 59 Iowa L.Rev. 164, 175-176; *Legislative Regulation of Retail Installment Financing* (1960) 7 UCLA L.Rev. 618, 685-686.)

Defendant insists that the rule is fair to borrowers and its use justified by the business needs of the creditor. First, it asserts, it is easier to calculate a rebate by the rule than by the actuarial method. Whatever may have been true in the late 19th and early 20th centuries, when businessmen were required to calculate rebates manually, the advent of computers has eliminated this basis as support for use of the rule; undoubtedly, in the very large majority of credit transactions today the lender has a mechanical device available to readily determine the rebate. Even for the relatively few creditors who do not have access to such a machine, the use of precalculated, published tables of refunds payable under the actuarial method would sustantially resolve the problem. (See, *Hunt, op cit. supra*, at p. 360.)

The second justification advanced by defendant is that the rule permits creditors to recover their transaction costs, and unless such costs are recovered, the borrower who does not prepay his loan in effect subsidizes the borrower who does. These transaction costs include those associated with extending credit in the first instance, such as the expense of advertising, depreciation, insurance, and other overhead expenses, the cost of carrying the credit after it has been extended, the expenses incurred in connection with bad debts, and collection and litigation expenses for delinquent loans. Defendant urges that these charges are spread over the term of the obligation upon the assumption that all payments will be made over the originally agreed-upon term of the contract, and that if the obligation is prepaid, the creditor does not recover them fully.

This problem may be resolved by requiring the borrower to pay a minimum finance charge for each transaction to reimburse the creditor for such costs. Furthermore, the charge to the debtor by application of the rule bears no relationship to the costs involved in the processing and collection of his particular loan. Thus, a borrower who has faithfully made installment payments on time and who prepays the loan early in the term in fact decreases the transaction costs to a lender attributable to his loan, but he is in effect penalized by being compelled to pay a charge to assure that the lender recoups its investment from debtors who are less conscientious. In these respects, the borrower who pays his debt early may, in effect, subsidize those who do not pay at all. (Cf. *Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260, 268-269 [152 Cal.Rptr. 446, 590 P.2d 22]; *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 741 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39].)[18]

Defendant asserts in addition that the use of the rule assures the creditor that he will receive the benefit of his bargain. Prepayment results in placing the creditor at the "risk of the market" in that he may not be able to obtain the same rate of return on new extensions of credit if interest rates are declining or the demand for credit is decreased, and he is put to the expense of seeking new investment opportunities and will incur additional transaction costs for such new investments. As to these last two items, they are included within the transaction costs referred to above. In the last few years the dramatic increase in the interest rate renders it unlikely that the creditor will suffer a loss from prepayment and reinvestment. The presumption that such a loss will occur and the automatic penalization of the borrower based upon such an assumption appears unsupportable.

Another important factor in considering the validity of defendant's arguments is that neither the necessity for the creditor to recoup transaction costs nor to afford him the benefit of his bargain can justify application of the "Rule of 78's" to the vast number of loans made to refinance or consolidate debts. In the case of such loans, the unamortized transaction costs are carried over into the new debt, and the creditor is obviously not put at the "risk of the market" since the new loan is extended at the same time the old loan is prepaid. The manifest

---

[18]In *Bondanza*, we held in view of the provisions of section 1671, subdivision (d), of the Civil Code that it was unlawful to impose upon a debtor a collection charge which bore no relationship to the actual cost of collection.

absence of any justification for applying the rule to such transactions has led *Hunt* to suggest that if the rule is retained at all it should only be applied to the complete retirement of a debt on prepayment. (*Hunt, op cit. supra,* at p. 358.)

Finally, defendant urges that the use of the rule to compute rebates is not unfair to the consumer because it yields results comparable to the actuarial method as utilized to compute the interest charge on mortgages of real property. Defendant's assertion is based on the traditional real estate financing transaction, in which the lender may charge a prepayment penalty (Civ. Code, § 2954.9) as well as a loan origination fee. When the penalty and the fee are added together, they may yield to the lender an amount comparable to the sum he would receive by application of the rule. We suggest this reasoning illustrates the shortcomings of the "Rule of 78's." Defendant admits that prepayment penalties are prohibited by statute for determining rebates under retail installment contracts. (Civ. Code, § 2982, subd. (e)(1).) While we recognize that the Board has determined that calculation of the rebate by the rule does not amount to a "prepayment penalty," as defined in Regulation Z (12 C.F.R. § 226.818 (b)), nevertheless the smaller refund to the consumer and the concomitant greater profit to the lender under the rule serves, in defendant's own words "as an alternate means by which . . . [it] can recoup the losses caused by prepayment of the contract." Thus, while application of the rule technically or semantically may not be termed a "penalty" in view of the Board's interpretation, it serves as a substitute for the prepayment penalty prohibited by statute.

In sum, the "Rule of 78's" is a hidden charge the operation of which is neither revealed to nor understood by the borrower, and it is a charge burdensome to the consumer and unjustified by the economic needs of the lender. Its adoption as the prevailing rule in this state is, of course, a legislative decision involving the weighing of policy matters as seen by legislators. Thus we would not be free to substitute our own views for those of the Legislature regarding the desirability of the rule even if plaintiff had sought a determination that it is invalid as a measure of the rebate because it is unfair to the consumer. The common law, which petitioner urges us to apply, is superseded when the Legislature acts. (*People* v. *Hickman* (1928) 204 Cal. 470, 479 [268 P. 909]; *Lowman* v. *Stafford* (1964) 226 Cal.App.2d 31, 39 [37 Cal.Rptr. 681].)

The Legislature has considered the rebate due a buyer on prepayment, the "Rule of 78's," and the manner of its disclosure a number of

times in recent years. (Rees-Levering Act: Stats. 1961, ch. 1626, § 4, pp. 3534, 3537; Stats. 1970, ch. 1003, § 1, pp. 1800, 1803; Unruh Act: Stats. 1969, ch. 625, pp. 1264, 1266; Stats. 1970, ch. 546, § 14, pp. 1040, 1043-1044; Stats. 1971, ch. 1061, § 1, pp. 2022, 2023.)[19] In 1979, it enacted several measures to alleviate the harshness of the rule in certain transactions. Beginning in 1983, Rees-Levering contracts calling for payment in more than 62 months may not utilize the rule to calculate the amount of rebate due a buyer on prepayment. (Stats. 1979, ch. 805, § 19, p. 2880.) As of January 1, 1981, the contract must include the following statement: "Because the refund [on prepayment] will be figured by the rule of 78's, the time when you prepay may affect the ultimate cost of credit under this agreement." (Civ. Code, § 2982, subd. (a)17(A).)[20] Thus it is clear that the Legislature is aware of the issue surrounding the "Rule of 78's" and has taken such action as it deems appropriate. We would abuse judicial authority if we were to embellish legislative requirements.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., and Newman, J., concurred.

---

[19]The 1969 amendment to the Unruh Act required the lender to "explain" the method for computing the rebate on prepayment. However, this requirement was repealed the following year, when the statute was amended to provide that a reference to the rule was sufficient identification of the method of computing the rebate.

[20]Similar restrictions are imposed with regard to installment sale contracts which come under the Unruh Act. (Civ. Code, § 1799.8, subd. (b); 1803.2, subd. (c).)