[Civ. No. 59155. Second Dist., Div. Three. Jan. 26, 1981.]

FARMERS INSURANCE EXCHANGE, Plaintiff and Appellant, v. FRANK SCHEPLER et al., Defendants and Respondents.

**COUNSEL**

Hagenbaugh & Murphy and Everett S. Hinchcliffe for Plaintiff and Appellant.

James A. Owen, L. Rob Werner and William L. Bart for Defendants and Respondents.

**OPINION**

**POTTER, Acting P. J.**—Plaintiff Farmers Insurance Exchange (hereinafter Farmers) appeals from the judgment of the superior court declaring its obligation to defend and to indemnify defendant Frank Schepler in a personal injury action against him brought by defendants Tina and Veda Marie Burrow. The suit sought recovery for personal injury incurred when a vehicle, described as a "dune buggy," in which Tina and Marie were passengers, overturned while Schepler was driving it on a dirt road in the Red Rock Canyon area.

Plaintiff's policy obligated it "[t]o pay all damages the insured becomes legally obligated to pay because of: (A) bodily injury to any person,...arising out of the ownership, maintenance or use...of the described automobile or a non-owned automobile." The pertinent definitions included: (1) "Automobile means a four wheel land motor vehicle designed for use principally upon public roads,..."; (2) "Described Automobile means the automobile described in the Declarations and includes...a newly acquired automobile and/or a substitute auto-

mobile"; (3) "Newly Acquired Automobile means an automobile, ownership of which is acquired by the named insured,...(b) if it is an additional automobile and the Company insures all automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company within thirty days thereafter...."

The evidence at the trial consisted entirely of the testimony of Schepler. He testified that he began acquiring the parts to assemble the vehicle two or three months before the accident. First, he acquired a Volkswagen transaxle, then an engine and a kit containing tubular frame parts to be welded together and attached to the transaxle and engine to form the basic structure of the vehicle. He began to assemble it approximately three weeks before the accident. Two weeks before the accident the assembly process had progressed to the point where the vehicle was capable of being driven. It was Schepler's intent that the vehicle, when completed, be fully equipped and licensed as a street vehicle. However, before it was completed, Schepler transported it by trailer to the Red Rock Canyon area where it was unloaded onto the dirt road[1] on which the accident occurred.

Schepler's testimony with respect to the intended use of the vehicle included his statement: "I planned on using it in the summertime as much or more than my pickup [Described Vehicle], but in the wintertime I would use the pickup more than the dune buggy." He also testified that "during the summertime I would use it for my primary vehicle. It gets good gas mileage. It is like a motorcycle. It is an enjoyable vehicle to drive when the weather is nice." Finally, Schepler testified as to his primary intent: "Well, here again, it comes back to the time of the year. I would use it primarily off the road in the wintertime, but in the summertime I would use it more as a—as an every-day vehicle." As between the two purposes, he stated: "If I had to pick between the two, I would say probably as a summertime vehicle more than off-road."

With this purpose in mind, Schepler had installed several items of equipment which were unnecessary for off-road use. It was equipped with street legal tires which were less suitable for off-street use than other available types. Street legal headlights, taillights and brake lights

---

[1]Schepler did not know whether the road was on public or private land but stated that it was graded and that a conventional automobile "could be driven" on it "without any problem at all."

were installed and operative. Turn indicator lights were installed but the operating switch was not yet connected, though Schepler had acquired it. Schepler had bought a horn but it was not yet installed. To qualify for street use, the vehicle also required a windshield with wipers and fenders, neither of which Schepler had purchased. They were, however, available anytime he was prepared to pay for them and he intended to acquire and install them "within the next week." When completed, the vehicle was to be licensed, rather than equipped with an off-road vehicle sticker.

On the Monday or Tuesday following the weekend of the accident, Schepler reported the circumstances of the accident to plaintiff.

The court made findings of fact. The following are pertinent to this appeal: "3. The vehicle, a dune buggy, being driven at the time of the accident had been built by the defendant, FRANK SCHEPLER. He first started acquiring the parts to build the dune buggy approximately two to three months prior to the accident. Approximately two weeks before the accident, the dune buggy first became operable as a vehicle. It was equipped with tires which were for street driving, two headlights, tail lights, brake lights, and turn indicators which had not yet been connected. All of the aforementioned parts would not be required by the Vehicle Code for off-road driving, but would be required for driving upon a public road. The dune buggy was not equipped with a windshield, windshield wipers, a horn, fenders, or turn indicators which were operable. These parts would be required by the Vehicle Code in order to operate the vehicle on a public road. It was 90% complete and not registered with the Department of Motor Vehicles. Defendant intended to use said vehicle upon the public road.

"4. The vehicle in question was designed principally for use on public roads, as defined in plaintiff's policy (Exhibit #1), which defines automobile as 'four wheel land motor vehicle designed for use principally upon public roads.'

"5. The date of acquisition of said vehicle was December 1, 1976, when defendant, FRANK SCHEPLER, completed work on the vehicle to the extent that it could be operated or moved, for the first time.

"6. The defendant, FRANK SCHEPLER, intended to complete construction of the vehicle by December 25, 1976.

"7. The vehicle in question, comes within the newly acquired automobile clause of the policy submitted as plaintiff's #1, which reads in part: '(b) if it is an additional automobile and the company insured all automobiles owned by the named insured on the date of such acquisition and the named insured notifies the company within thirty (30) days thereafter';

"8. One or two days after the accident of December 13, 1976, defendant, FRANK SCHEPLER notified plaintiff, FARMERS INSURANCE EXCHANGE, of the accident with said vehicle."

From these findings, the court concluded: "[P]laintiff is obliged under the insurance policy in question, to defend FRANK SCHEPLER in the action brought against him by TINA and MARIE BURROWS [sic], and to indemnify FRANK SCHEPLER in the event recovery is had against FRANK SCHEPLER in the above mentioned action, in accordance with the terms and conditions of said insurance policy."

## Contentions

Plaintiff contends that the court erred in holding that the vehicle was within the coverage of its policy because: (1) it "was not an automobile as defined" therein; and (2) it was not "newly acquired" when Schepler informed plaintiff of his ownership.

Defendants controvert both of plaintiff's contentions.

## Discussion

### Summary

■ The provisions of plaintiff's policy must be construed according to the insured's reasonable expectation of coverage and any doubts as to meaning must be resolved against the insurer. So construed, plaintiff's policy covered Schepler's vehicle as an automobile. The vehicle was, moreover, newly acquired when Schepler advised plaintiff of its acquisition.

### Any Ambiguity Must Be Resolved Against the Insurer

"[U]ncertainty or ambiguity must be resolved against the insurer and in favor of the insured." (*Universal Underwriters Ins. Co.* v. *Gewirtz* (1971) 5 Cal.3d 246, 250 [95 Cal.Rptr. 617, 486 P.2d 145].)

In *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], our Supreme Court "applied the doctrine of the adhesion contract to insurance policies," and held that "we must ascertain that meaning of the contract which the insured would reasonably expect. [Fn. omitted.]" (*Id.*, at pp. 269-270.) Moreover, in this respect, the court held: "[W]e apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. [Fn. omitted.]" (*Id.*, at p. 269.)

If, therefore, the language of plaintiff's policy is reasonably capable of being construed as providing coverage with respect to the vehicle constructed by Schepler, the trial court judgment must be affirmed.

*The Policy Provision Does Not Unambiguously Exclude the Dune Buggy From Coverage*

The general coverage of the policy extends to all liability arising out of the use of automobiles. The definition of an automobile limits this coverage by requiring that the automobile be "a four wheel land motor vehicle designed for use principally upon public roads . . . ." This constitutes an exception to the basic underlying obligation and thus is effective only to the extent that it clearly apprises the insured of its effect. Plaintiff contends that the policy provision "is clear, unambiguous, and susceptible to only one reasonable interpretation." It cites the provisions of the Vehicle Code requiring that to be lawfully operated on public roads, all vehicles must be equipped with turn signal systems, an adequate windshield, a horn in good working order, and fenders, and must be registered and carry license plates. The foregoing equipment requirements do not apply to "off highway vehicles."

At the time of the accident, Schepler's vehicle was not qualified lawfully to operate on public roads, but the conclusion does not necessarily follow that it was not "designed" for such use. One meaning of the term "designed" is "[f]it, adapted, prepared, suitable, appropriate." (Black's Law Dict. (4th ed. 1951) p. 534, col. 1.) However, that same source states another meaning, as follows: "[i]ntended, adapted, or designated." (*Ibid.*) The phrase "designed for" is commonly employed to designate the purpose for which an item of personal property is constructed.

In *United States* v. *Sommerhauser* (D.C.Kan. 1932) 58 F.2d 812, an ordinary Chevrolet truck was held not to come within the description of property subject to seizure under the Prohibition Act, as "'property designed for the manufacture of liquor intended for use in violating this chapter or which has been so used . . . .'" (*Id.*, at p. 813.) In holding that the vehicle was not subject to seizure, the court said (*ibid.*): "The government contends that the word 'designed' means the use to which the owner intends to put the property. 'Design' is sometimes synonymous with 'intent'; but physical property has no intention; and ordinarily, if property is spoken of as '*designed*,' it *refers to the purpose for which it was constructed*. An ordinary truck may be used as an aid in the manufacture of liquor; the owner intends to so use it; but the owner did not design the truck; the truck was *designed by its manufacturer* for the transportation of any commodity; no person would ever colloquially say that an ordinary truck was 'designed for the manufacture of liquor.'" (Italics added.)

A like meaning was given the words "designed for" in *English* v. *Old American Insurance Company* (Mo. 1968) 426 S.W.2d 33. There the question was whether a half-ton pickup truck was within the coverage of a policy covering "'a private *automobile* designed primarily for transporting persons.'" (*Id.*, at p. 35.) This provision was held to be ambiguous so as to make relevant the testimony of the manufacturer's merchandising manager. The court said (*id.*, at p. 39): "The clear meaning of the words 'designed primarily' within the context of the policy issued by defendant is the chief or *principal purpose for which the vehicle was constructed*, and *the purpose intended by the manufacturer is controlling*. Ultimately, therefore, whether plaintiff may recover under the policy depends upon whether there was substantial evidence that the manufacturer of the 1962 Chevrolet half ton pickup intended its principal purpose as that of transporting persons." (Italics added.)

*Gulf Ins. Co.* v. *Edgerly* (1973) 31 Cal.App.3d 334 [107 Cal.Rptr. 246], upon which plaintiff relies, is not inconsistent with the foregoing authorities. A judgment for the insurer on a coverage issue was reversed. The trial court had held that a "minibike" came within the exclusion in a comprehensive personal liability endorsement to a homeowner's policy. The exclusion provided that "comprehensive liability coverage shall not apply 'to the ownership, maintenance, operation, use, loading or unloading of (1) automobiles or midget automobiles while away from the premises or the ways immediately adjoining. . . .'" (*Id.*,

at p. 336.) Supplementary definitions included a definition of "auto-mobile" as follows (*ibid.*): "'(e) "Automobile" means a land motor vehicle, trailer or semitrailer; but the term "automobile" does not include, except while being towed by or carried on an automobile, any of the following: any crawler or farm-type tractor, farm implement or if not subject to motor vehicle registration, any equipment which is designed for use principally off public roads.'"

Equipment "designed for use principally off public roads" was thus exempted from the exclusion. The settled rule "that where policy provisions are reasonably susceptible to different interpretations, doubts must be resolved against the insurer" (*id.*, at p. 340), therefore, favored a finding that the minibike was designed for off-street use. In reaching the conclusion that the policy provision was reasonably susceptible to the interpretation that the minibike was not an automobile, as defined in the policy, the court said (*id.*, at pp. 338-339): "It is evident that the Lether minibike, if it is to be excluded from coverage under the policy must come within the definition of a 'midget automobile.' The term 'automobile' as defined in the policy does not include (if not subject to motor vehicle registration) 'any equipment which is designed for use principally off public roads.' The uncontroverted evidence was that the Lether minibike was designed for use off public roads; it had no tail-light, headlight, or turn signal indicators. It could not have been legally operated on the road. As an off road vehicle, at the time of the accident the minibike was not subject to motor vehicle registration. (*Yosemite Park & Curry Co. v. Dept. of Motor Vehicles*, 177 Cal.App.2d 448, 454 [2 Cal.Rptr. 431]; 41 Ops.Cal.Atty.Gen. 129, 130.) It thus was not an 'automobile' as contemplated by the policy. [Fns. omitted.]"

The court does not describe all the "uncontroverted evidence . . . that the Lether minibike was designed for use off public roads. . . ." (*Id.*, at p. 338.) It does state, however, in footnote 1 on page 339, "Mr. Lether testified that the minibike was not intended for road use." *Edgerly*, therefore, does not stand for the proposition that to escape off-street status a vehicle must necessarily be fully legally qualified for use on public roads. The lack of any accessories needed only for on-street use was merely another element of the evidence as to the manufacturer's intent. The fact that the minibike was totally devoid of accessories which were unnecessary for off-street use and required for street use was, of course, *strongly* corroborative of Lether's testimony that the manufacturer did not intend the minibike for road use.

The evidence in the case at bench is quite different. Schepler was the manufacturer of the vehicle. Plaintiff does not contend that the evidence fails to support the court's finding that it was his intent to design the vehicle "principally for use on public roads." The manufacturer's intent was, therefore, exactly opposite to that shown in *Edgerly*.

Contrary to appellant's assertion that Schepler's intention was "previously undisclosed" until he testified, it was clearly manifested by his installation of street legal headlights and tail lights and street legal tires which were not suitable for off-street use, his partial installation of turn signals which were unnecessary for off-street use, and his acquisition of a horn.

In view of Schepler's intent, it was not unreasonable for him to expect that the policy covered his operation of the vehicle. If he had purchased an additional, conventional automobile and an accident had occurred on the same graded dirt road where it might have been operated "without any problem at all," there would be no question but that he had coverage so long as he reported his ownership within 30 days of its acquisition. Schepler did not by his conduct expose the carrier to unanticipated risks such as would be the case if the vehicle were being operated where a conventional vehicle could not appropriately be driven. Schepler's expectation of coverage, therefore, was not unreasonable and the trial court's interpretation of the policy was correct.

*The Vehicle Was Newly Acquired*

■ Plaintiff's alternative contention is that, even if the vehicle were an automobile within the provisions of the policy, it did not qualify as being newly acquired because it was an additional vehicle and its acquisition was not reported within 30 days thereof. The court found, however, that "[t]he date of acquisition of said vehicle was December 1, 1976, when defendant, FRANK SCHEPLER, completed work on the vehicle to the extent that it could be operated or moved, for the first time."

There is no conflict in the evidence as to when the vehicle was first operable. Schepler's testimony not only shows that it was not operable until on or about December 1, 1976, but that until approximately one week prior thereto no assembly work had been undertaken. Though Schepler purchased the transaxle and engine and frame kit sometime up to two or three months previously, he had only a collection of parts usable to construct a vehicle before the assembly began.

A motor vehicle is, by definition, a "vehicle which is self-propelled." (Veh. Code, § 415.) A pile of unassembled parts is neither a vehicle nor is it capable of self-propulsion.

To support its contention that the Schepler vehicle was acquired by Schepler when he purchased the parts from which it was assembled, plaintiff relies exclusively upon the decision of the Fourth District in *Williams* v. *Standard Accident Ins. Co.* (1958) 158 Cal.App.2d 506 [322 P.2d 1026]. Williams was injured in an automobile accident involving a 1941 Chevrolet owned and operated by Alvin Weishaar, Standard's insured. The policy covered newly acquired vehicles "'if the named insured notifies the company within thirty days following the date of its delivery to him . . . .'" (*Id.*, at p. 508.) Williams recovered a judgment against Weishaar and sued Standard to collect it. In the court trial, judgment was entered for the defendant insurer. The evidence with respect to the coverage issue was that Standard's policy covered a described 1941 Dodge owned by Weishaar. In January 1952, Weishaar purchased the Chevrolet. Weishaar testified that when he purchased the Chevrolet, "there were no wheels or tires on it, 'didn't have any windshields, the windshields were broke, the headlight was gone, upholstery was tore up, it needed two new fenders, needed a bumper'; that it needed a radiator and a grill; that about two weeks after the Chevrolet was delivered to him, he started rebuilding it and did not drive it until about the 3d of May, 1952." (*Ibid.*) The accident occurred May 5, 1952, and Standard was notified the day following the accident. The court held that a trial court finding that the Chevrolet was delivered to Weishaar more than 30 days prior to May 5 was supported by substantial evidence. The court pointed out that the trial court was not "required to believe the testimony of Weishaar as to the condition of the Chevrolet when it was delivered to him" (*id.*, at p. 509), and that Weishaar "did not state when wheels or tires were put on or when the car could have been operated" (*id.*, at pp. 509-510). The court noted, moreover, that Weishaar "purchased it as an automobile and secured a certificate of title thereto and possession thereof, as such, several months prior to the accident and immediately started to repair it." (*Id.*, at p. 510.) It stated that the policy provision "cannot be interpreted as a provision that notification to the company is to be given within 30 days after completing repairs on an automobile or after making it operable." (*Ibid.*)

The situation in *Williams* is in no respect comparable to that with which we are here involved. Weishaar's Chevrolet was essentially an automobile, albeit one in a state of monumental disrepair. It was not

simply a collection of parts suitable for assembly into the basic elements of a vehicle. Consequently, his reconstruction of it constituted "ownership, maintenance or use" of an automobile contemplated by the policy. (*Id.*, at p. 510.) Schepler's activities in simply collecting parts cannot be so characterized. There was no automobile to own, maintain or use until the assembly progressed to a point that a self-propelled vehicle was created. The *Williams* case is, therefore, not persuasive.

The judgment is affirmed.

Cobey, J., and Allport, J., concurred.